244 F.3d 1007 (9th Cir. 2001)
 PLANNED PARENTHOOD OF THE COLUMBIA/WILLAMETTE INC.; PORTLAND FEMINIST WOMEN'S HEALTH CENTER; ROBERT CRIST, M.D.; WARREN M. HERN, M.D.;ELIZABETH NEWHALL, M.D.; JAMES NEWHALL, M.D., Plaintiffs-Appellees,
and
KAREN SWEIGERT, M.D., Plaintiff,
v.
AMERICAN COALITION OF LIFE ACTIVISTS; ADVOCATES FOR LIFE MINISTRIES; MICHAEL BRAY; ANDREW BURNETT; DAVID A. CRANE; TIMOTHY PAUL DRESTE; MICHAEL B. DODDS; JOSEPH L. FOREMAN; CHARLES ROY MCMILLAN; STEPHEN P. MEARS; BRUCE EVAN MURCH; CATHERINE RAMEY; DAWN MARIE STOVER; CHARLES WYSONG, Defendants,
and
MONICA MIGLIORINO MILLER; DONALD TRESHMAN, Defendants-Appellants.
PLANNED PARENTHOOD OF THE COLUMBIA/WILLAMETTE INC.; PORTLAND FEMINIST WOMEN'S HEALTH CENTER; ROBERT CRIST, M.D.; WARREN M. HERN, M.D.; ELIZABETH NEWHALL, M.D.; JAMES NEWHALL, M.D., Plaintiffs-Appellees,
and
KAREN SWEIGERT, M.D., Plaintiff,
v.
AMERICAN COALITION OF LIFE ACTIVISTS; ADVOCATES FOR LIFE MINISTRIES; MICHAEL BRAY; ANDREW BURNETT; DAVID A. CRANE; TIMOTHY PAUL DRESTE; JOSEPH L. FOREMAN; STEPHEN P. MEARS; MONICA MIGLIORINO MILLER; CATHERINE RAMEY; DAWN MARIE STOVER; DONALD TRESHMAN; CHARLES WYSONG, Defendants,
and
MICHAEL DODDS; CHARLES ROY MCMILLAN; BRUCE EVAN MURCH, Defendants-Appellants.
PLANNED PARENTHOOD OF THE COLUMBIA/WILLAMETTE INC.; PORTLAND FEMINIST WOMEN'S HEALTH CENTER; ROBERT CRIST, M.D.; WARREN M. HERN, M.D.; ELIZABETH NEWHALL, M.D.; JAMES NEWHALL, M.D., Plaintiffs-Appellees,
and
KAREN SWEIGERT, M.D., Plaintiff,
v.
AMERICAN COALITION OF LIFE ACTIVISTS; ADVOCATES FOR LIFE MINISTRIES; MICHAEL BRAY; ANDREW BURNETT; DAVID A. CRANE; MICHAEL DODDS; CHARLES ROY MCMILLAN; STEPHEN P. MEARS; MONICA MIGLIORINO MILLER; BRUCE EVAN MURCH; CATHERINE RAMEY; DAWN MARIE STOVER; DONALD TRESHMAN, Defendants,
and
TIMOTHY PAUL DRESTE; JOSEPH L. FOREMAN; CHARLES WYSONG, Defendants-Appellants.
PLANNED PARENTHOOD OF THE COLUMBIA/WILLAMETTE INC.; PORTLAND FEMINIST WOMEN'S HEALTH CENTER; ROBERT CRIST, M.D.; WARREN M. HERN, M.D.; ELIZABETH NEWHALL, M.D.; JAMES NEWHALL, M.D., Plaintiffs-Appellees,
and
KAREN SWEIGERT, M.D., Plaintiff,
v.
AMERICAN COALITION OF LIFE ACTIVISTS; ADVOCATES FOR LIFE MINISTRIES; MICHAEL BRAY; ANDREW BURNETT; DAVID A. CRANE; CATHERINE RAMEY; DAWN MARIE STOVER, Defendants-Appellants,
and
TIMOTHY PAUL DRESTE; MICHAEL DODDS; JOSEPH L. FOREMAN; CHARLES ROY MCMILLAN; STEPHEN P. MEARS; MONICA MIGLIORINO MILLER; BRUCE EVAN MURCH; DONALD TRESHMAN; CHARLES WYSONG, Defendants.
PLANNED PARENTHOOD OF THE COLUMBIA/WILLAMETTE INC.; PORTLAND FEMINIST WOMEN'S HEALTH CENTER; ROBERT CRIST, M.D.; WARREN M. HERN, M.D.; ELIZABETH NEWHALL, M.D.; JAMES NEWHALL, M.D., Plaintiffs-Appellees,
v.
AMERICAN COALITION OF LIFE ACTIVISTS; ADVOCATES FOR LIFE MINISTRIES; MICHAEL BRAY; ANDREW BURNETT; DAVID A. CRANE; TIMOTHY PAUL DRESTE; MICHAEL B. DODDS; JOSEPH L. FOREMAN; CHARLES ROY MCMILLAN; BRUCE EVAN MURCH; CATHERINE RAMEY; DAWN MARIE STOVER; DONALD TRESHMAN; CHARLES WYSONG, Defendants.
PAUL DEPARRIE, Movant-Appellant.
PLANNED PARENTHOOD OF THE COLUMBIA/WILLAMETTE INC.; PORTLAND FEMINIST WOMEN'S HEALTH CENTER; ROBERT CRIST, M.D.; WARREN M. HERN, M.D.; ELIZABETH NEWHALL, M.D.; JAMES NEWHALL, M.D.; KAREN SWEIGERT, M.D., individually and on behalf of all persons similarly situated, Plaintiffs-Appellees,
v.
AMERICAN COALITION OF LIFE ACTIVISTS; ADVOCATES FOR LIFE MINISTRIES; MICHAEL BRAY; ANDREW BURNETT; DAVID CRANE; TIMOTHY PAUL DRESTE; MICHAEL DODDS; JOSEPH L. FOREMAN; CHARLES ROY MCMILLAN; MONICA MIGLIORINO MILLER; BRUCE EVAN MURCH; CATHERINE RAMEY; DAWN MARIE STOVER; DONALD TRESHMAN; CHARLES WYSONG, Defendants-Appellants.
 Nos. 99-35320, 99-35331, 99-35325, 99-35333, 99-35327, 99-35405
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued September 12, 2000
Submitted September 15, 2000*
Filed March 28, 2001
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted]
 Christopher A. Ferrara, American Catholic Lawyers Association Inc., Ramsey, New Jersey, argued the cause for all Appellants, and submitted a brief on behalf of appellant Donald J. Treshman.
 Maria T. Vullo, Paul, Weiss, Rifkind, Wharton & Garrison, New York, New York, argued the cause for Appellees.
 Stephen J. Safranek, Thomas More Center for Law & Justice, Ann Arbor, Michigan, for Appellants American Coalition of Life Activists, Advocates for Life Ministries, Andrew Burnett, David Crane, Catherine Ramey, Michael Bray and Dawn Stover.
 Robert M. O'Neil, for amicus curiae Thomas Jefferson Center for the Protection of Free Expression, Charlottesville, Virginia, in support of reversal.
 Paul deParrie, Portland, Oregon, amicus curiae, in support of reversal.
 Michael H. Simon, Perkins Coie LLP, Portland, Oregon, for amicus curiae ACLU Foundation of Oregon, Inc., in support of affirmance.
 Susan M. Popik, Chapman, Popik & White, San Francisco,California, for amici curiae Feminist Majority Foundation, Center for Reproductive Law and Policy, National Abortion and Reproductive Rights Action League and NARAL Foundation, National Abortion Federation, National Coalition of Abortion Providers, National Organization for Women Foundation, NOW Legal Defense and Education Fund, National Women's Health Foundation, Northwest Women's Law Center, Physicians for Reproductive Choice and Health, and Women's Law Project, in support of affirmance.
 Richard Blumenthal, Attorney General of Connecticut, for amici curiae Connecticut, Arizona, California, Colorado, Hawaii, Kansas, Montana, Nevada, New York, Oklahoma, Oregon and Washington, in support of affirmance.
 Erwin Chemerinsky, University of Southern California Law School, Los Angeles, California, for amici curiae AntiDefamation League, the American Jewish Committee, Hadassah, the Women's Zionist Organization of America, Inc., in support of affirmance.
 Appeal from the United States District Court for the District of Oregon Robert E. Jones, District Judge, Presiding. D.C. No.CV-95-01671-REJ.
 Before: Alex Kozinski and Andrew J. Kleinfeld, Circuit Judges, and William W Schwarzer, District Judge.**
 KOZINSKI, Circuit Judge:
 
 
 1
 Anti-abortion activists intimidated abortion providers by publishing their names and addresses. A jury awarded more than $100 million in actual and punitive damages against the activists, and the district court enjoined their speech. We consider whether such speech is protected by the First Amendment.
 
 
 2
 * During a 1995 meeting called to mark the anniversary of Roe v. Wade, 410 U.S. 113 (1973), the American Coalition of Life Activists (ACLA) unveiled a poster listing the names and addresses of the "Deadly Dozen," a group of doctors who perform abortions. In large print, the poster declared them guilty of "crimes against humanity" and offered $5,000 for information leading to the "arrest, conviction and revocation of license to practice medicine." The poster was later published in an affiliated magazine, Life Advocate, and distributed at ACLA events.
 
 
 3
 Later that year, in front of the St. Louis federal courthouse, ACLA presented a second poster, this time targeting Dr. Robert Crist. The poster accused Crist of crimes against humanity and various acts of medical malpractice, including a botched abortion that caused the death of a woman. Like the Deadly Dozen List, the poster included Crist's home and work addresses, and in addition, featured his photograph. The poster offered $500 to "any ACLA organization that successfully persuades Crist to turn from his child killing through activities within ACLA guidelines" (which prohibit violence).
 
 
 4
 In January 1996, at its next Roe anniversary event, ACLA unveiled a series of dossiers it had compiled on doctors, clinic employees, politicians, judges and other abortion rights supporters. ACLA dubbed these the "Nuremberg Files, " and announced that it had collected the pictures, addresses and other information in the files so that Nuremberg-like war crimes trials could be conducted in "perfectly legal courts once the tide of this nation's opinion turns against the wanton slaughter of God's children." ACLA sent hard copies of the files to Neal Horsley, an anti-abortion activist, who posted the information on a website.[1] The website listed the names of doctors and others who provide or support abortion and called on visitors to supply additional names.[2] The website marked the names of those already victimized by anti-abortion terrorists, striking through the names of those who had been murdered and graying out the names of the wounded. Although ACLA's name originally appeared on the website, Horsley removed it after the initiation of this lawsuit.
 
 
 5
 Neither the posters nor the website contained any explicit threats against the doctors. But the doctors knew that similar posters prepared by others had preceded clinic violence in the past. By publishing the names and addresses, ACLA robbed the doctors of their anonymity and gave violent anti-abortion activists the information to find them. The doctors responded to this unwelcome attention by donning bulletproof vests, drawing the curtains on the windows of their homes and accepting the protection of U.S. Marshals.
 
 
 6
 Some of the doctors went on the offensive. Along with two Portland-based health centers, the doctors sued ACLA, twelve activists and an affiliated organization, alleging that their threatening statements violated state and federal law, including the Freedom of Access to Clinic Entrances Act of 1994 (FACE), 18 U.S.C. S 248.[3] Because the doctors claimed they were harmed by defendants' speech, the district court instructed the jury that defendants could only be liable if their statements were "true threats" and therefore unprotected by the First Amendment.[4] In a special verdict, the jury found that all the statements were true threats and awarded the doctors $107 million in actual and punitive damages.[5] The district court then issued an injunction barring defendants from making or distributing the posters, the webpage or anything similar. ACLA and the other defendants appeal, claiming thattheir statements are protected by the First Amendment.[6]
 
 II
 
 7
 A. Extreme rhetoric and violent action have marked many political movements in American history. Patriots intimidated loyalists in both word and deed as they gathered support for American independence. John Brown and other abolitionists, convinced that God was on their side, committed murder in pursuit of their cause. In more modern times, the labor, antiwar, animal rights and environmental movements all have had their violent fringes. As a result, much of what was said even by nonviolent participants in these movements acquired a tinge of menace.
 
 
 8
 The Supreme Court confronted this problem in NAACP v. Claiborne Hardware Co., 458 U.S. 886 (1982). There, a group of white-owned businesses sued the NAACP and others who organized a civil rights boycott against the stores. To give the boycott teeth, activists wearing black hats stood outside the stores and wrote down the names of black patrons. After these names were read aloud at meetings and published in a newspaper, sporadic acts of violence were committed against the persons and property of those on the list. At one public rally, Charles Evers, a boycott organizer, threatened that boycott breakers would be "disciplined" and warned that the sheriff could not protect them at night. See id. at 902. At another rally, Evers stated, "If we catch any of you going in any of them racist stores, we're gonna break your damn neck." See id. The Mississippi courts held the boycott organizers liable based on Evers's statements and the activities of the black-hatted activists.
 
 
 9
 The Supreme Court acknowledged that Evers's statements could be interpreted as inviting violent retaliation, "or at least as intending to create a fear of violence whether or not improper discipline was specifically intended." Id. at 927 (emphasis added). Nevertheless, it held that the statements were protected because there was insufficient evidence that Evers had "authorized, ratified, or directly threatened acts of violence." Id. at 929. Nor was publication of the boycott violators' names a sufficient basis for liability, even though collecting and publishing the names contributed to the atmosphere of intimidation that had harmed plaintiffs. See id. at 925-26. While Charles Evers and the defendants in our case pursued very different political goals, the two cases have one key thing in common: Political activists used words in an effort to bend opponents to their will.
 
 
 10
 The First Amendment protects ACLA's statements no less than the statements of the NAACP. Defendants can onlybe held liable if they "authorized, ratified, or directly threatened" violence. If defendants threatened to commit violent acts, by working alone or with others, then their statements could properly support the verdict. But if their statements merely encouraged unrelated terrorists, then their words are protected by the First Amendment.
 
 
 11
 Political speech may not be punished just because it makes it more likely that someone will be harmed at some unknown time in the future by an unrelated third party. In Brandenburg v. Ohio, 395 U.S. 444 (1969) (per curiam), the Supreme Court held that the First Amendment protects speech that encourages others to commit violence, unless the speech is capable of "producing imminent lawless action. " Id. at 447. It doesn't matter if the speech makes future violence more likely; advocating "illegal action at some indefinite future time" is protected. Hess v. Indiana , 414 U.S. 105, 108 (1973) (per curiam). If the First Amendment protects speech advocating violence, then it must also protect speech that does not advocate violence but still makes it more likely. Unless ACLA threatened that its members would themselves assault the doctors, the First Amendment protects its speech.[7]
 
 
 12
 B. ACLA's speech no doubt frightened the doctors, but the constitutional question turns on the source of their fear.[8] The doctors might have understood the statements as veiled threats that ACLA's members (or others working with ACLA) would inflict bodily harm on the doctors unless they stopped performing abortions. So interpreted, the statements are unprotected by the First Amendment, regardless of whether the activists had the means or intent to carry out the threats. See United States v. Orozco-Santillan, 903 F.2d 1262, 1265 n.3 (9th Cir. 1990). So long as they should have foreseen that the doctors would take the threats seriously, the speech is unlawful. See id. at 1265.[9]
 
 
 13
 But the statements might also have scared the doctors in another way. By singling out the plaintiffs from among the thousands across the country who are involved in delivering abortion services, ACLA called them to the unfriendly attention of violent anti-abortion activists. And by publishing the doctors' addresses, ACLA made it easier for any would-be terrorists to carry out their gruesome mission.[10] From the doctors' point of view, such speech may be just as frightening as a direct threat, but it remains protected under Claiborne Hardware.
 
 
 14
 The jury would be entitled to hold defendants liable if it understood the statements as expressing their intention to assault the doctors but not if it understood the statements as merely encouraging or making it more likely that others would do so. But the jury instruction was ambiguous on this critical point. The instruction provided that "[a] statement is a `true threat' when a reasonable person making the statement would foresee that the statement would be interpreted bythose to whom it is communicated as a serious expression of an intent to bodily harm or assault." Jury Instruction No. 10, at 14. This instruction was consistent with our previous threat cases. See Lovell v. Powell Unified Sch. Dist., 90 F.3d 367, 372 (9th Cir. 1996). But in those previous cases, there was no need to emphasize that threats must be direct because the speakers themselves made it perfectly clear that they would be the ones to carry out the threats.[11] Under the instruction in this case, the jury could have found the anti-abortion activists liable based on the fact that, by publishing the doctors' names, the activists made it more likely that the doctors would be harmed by third parties.
 
 
 15
 This is not a fanciful possibility. The record contains much evidence that the doctors were frightened, at least in part, because they anticipated that their unwelcome notoriety could expose them to physical attacks from third parties unrelated to defendants. For example, plaintiff Dr. Elizabeth Newhall testified, "I feel like my risk comes from being identified as a target. And . . . all the John Salvis in the world know who I am, and that's my concern."[12] Testimony of Elizabeth Newhall, Planned Parenthood of the Columbia/Willamette, Inc. v. American Coalition of Life Activists , No. CV 9501671-JO, at 302 (D. Or. Jan. 8, 1999); see also id. at 290 ("[U]p until January of `95, I felt relatively diluted by the-you know, in the pool of providers of abortion services. I didn't feel particularly visible to the people who were--you know, to the John Salvis of the world, you know. I sort of felt one of a big, big group."). Likewise, Dr. Warren Martin Hern, another plaintiff, testified that when he heard he was on the list, "I was terrified . . . . [I]t's hard to describe the feeling that --that you are on a list of people to--who have been brought to public attention in this way. I felt that this was a--a list of doctors to be killed." Testimony of Warren Martin Hern, Planned Parenthood, No. CV 95-01671-JO, at 625 (Jan. 11, 1999).
 
 
 16
 Were the instruction taken literally, the jury could have concluded that ACLA's statements contained "a serious expression of intent to harm," not because they authorized or directly threatened violence, but because they put the doctors in harm's way. However, the First Amendment does not permit the imposition of liability on that basis.
 
 
 17
 C. Although the jury instruction was ambiguous, we need not decide whether the ambiguity was so great as to require us to set aside the verdict. Even if the jury drew only the permissible inference, we must evaluate the record for ourselves to ensure that the judgment did not trespass on the defendants' First Amendment rights. Specifically, we must determine whether ACLA's statements could reasonably be construed as saying that ACLA (or its agents) would physically harm doctors who did not stop performing abortions. Because the district court rejected the First Amendment claim, we conduct a de novo review of both the law and the relevant facts. See Lovell, 90 F.3d at 370. The question therefore is not whether the facts found below are supported by the record but whetherwe, looking at the record with fresh eyes, make the same findings. If we disagree with the district court, our findings prevail. See Eastwood v. National Enquirer, Inc., 123 F.3d 1249, 1252 (9th Cir. 1997).
 
 
 18
 We start by noting that none of the statements ACLA is accused of making mention violence at all. While pungent, even highly offensive, ACLA's statements carefully avoid threatening the doctors with harm "in the sense that there are no `quotable quotes' calling for violence against the targeted providers." Planned Parenthood of the Columbia/Willamette, Inc. v. American Coalition of Life Activists , 23 F. Supp. 2d 1182, 1186 (D. Or. 1998). Instead, ACLA offers rewards to those who take nonviolent measures against the doctors, such as seeking the revocation of their medical licenses and protesting their activities. One poster talks about persuading Crist to "turn from his child killing," but stops short of suggesting any violence or other criminal conduct against him. The website seeks to gather information about abortion supporters and encourages others to do the same. ACLA also speaks of future "perfectly legal" Nuremberg-like trials, to be held at a time when public opinion has turned in its favor.
 
 
 19
 We recognize that the words actually used are not dispositive, because a threat may be inferred from the context in which the statements are made.[13] However, there are at least two kinds of ambiguity that context can resolve. The first deals with statements that call for violence on their face, but are unclear as to who is to commit the violent acts--the speaker or a third party. All cases of which we are aware fall into this category: They hold that, where the speaker expressly mentions future violence, context can make it clear that it is the speaker himself who means to carry out the threat. See note 13 supra.
 
 
 20
 A more difficult problem arises when the statements, like the ones here, not only fail to threaten violence by the defendants, but fail to mention future violence at all.[14] Can context supply the violent message that language alone leaves out? While no case answers this question, we note important theoretical objections to stretching context so far. Context, after all, is often not of the speaker's making. For example, the district court in this case admitted evidence of numerous acts of violence surrounding the abortion controversy, almost none of them committed by the defendants or anyone connected with them.[15] In the jury's eyes, then, defendants' statements were infused with a violent meaning, at least in part, because of the actions of others. If this were a permissible inference, it could have a highly chilling effect on public debate on any cause where somebody, somewhere has committed a violent act in connection with that cause. A party who does not intend to threaten harm, nor say anything at all suggesting violence, would risk liability by speaking out in the midst of a highly charged environment.
 
 
 21
 In considering whether context could import a violent meaning to ACLA's non-violent statements, we deem it highly significant that all the statements were made in the context of public discourse, not in direct personal communications. Although the First Amendment does not protect all forms of public speech, such as statements inciting violence or an imminent panic, the public nature of the speech bears heavily upon whether it could be interpreted as a threat.[16] As we held in McCalden v. California Library Ass'n, 955 F.2d 1214 (9th Cir. 1992), "public speeches advocating violence" are given substantially more leeway under the First Amendment than "privately communicated threats." Id. at 1222; see also Orozco-Santillan, 903 F.2d at 1265 ("Although a threat must be `distinguished from what is constitutionally protected speech,' this is not a case involving statements with a political message." (quoting Watts v. United States, 394 U.S. 705, 707 (1969) (per curiam)).
 
 
 22
 There are two reasons for this distinction: First, what may be hyperbole in a public speech may be understood (and intended) as a threat if communicated directly to the person threatened, whether face-to-face, by telephone or by letter. In targeting the recipient personally, the speaker leaves no doubt that he is sending the recipient a message of some sort. In contrast, typical political statements at rallies or through the media are far more diffuse in their focus because they are generally intended, at least in part, to shore up political support for the speaker's position.
 
 
 23
 Second, and more importantly, speech made through the normal channels of group communication, and concerning matters of public policy, is given the maximum level of protection by the Free Speech Clause because it lies at the core of the First Amendment. See Claiborne Hardware , 458 U.S. at 926-27 ("Since respondents would impose liability on the basis of a public address--which predominantly contained highly charged political rhetoric lying at the core of the First Amendment--we approach this suggested basis of liability with extreme care."). With respect to such speech, we must defer to the well-recognized principle that political statements are inherently prone to exaggeration and hyperbole. See Watts, 394 U.S. at 708 ("The language of the political arena . . . is often vituperative, abusive, and inexact. " (citation omitted)). If political discourse is to rally public opinion and challenge conventional thinking, it cannot be subdued. Nor may we saddle political speakers with implications their words do not literally convey but are later "discovered " by judges and juries with the benefit of hindsight and by reference to facts over which the speaker has no control.
 
 
 24
 Our guiding light, once again, is Claiborne Hardware. There, Charles Evers expressly threatened violence when he warned the boycott violators that "we're gonna break your damn neck[s]," and that the sheriff could not protect them from retribution. See 458 U.S. at 902. Evers made these statements at a time when there had already been violence againstthe boycott breakers. Evers did not himself identify specific individuals to be disciplined, but his associates had gathered and published the names, and there's no doubt that the black community in the small Mississippi county where the boycott was taking place knew whom Evers was talking about. The Supreme Court held that, despite his express call for violence, and the context of actual violence, Evers's statements were protected, because they were quintessentially political statements made at a public rally, rather than directly to his targets. See id. at 928-29.
 
 
 25
 If Charles Evers's speech was protected by the First Amendment, then ACLA's speech is also protected.[17] Like Evers, ACLA did not communicate privately with its targets; the statements were made in public fora. And, while ACLA named its targets, it said nothing about planning to harm them; indeed, it did not even call on others to do so. This stands in contrast to the words of Charles Evers, who explicitly warned his targets that they would suffer broken necks and other physical harm. Under the standard of Claiborne Hardware, the jury's verdict cannot stand.[18]
 
 
 26
 VACATED and REMANDED with instructions that the district court dissolve the injunction and enter judgment for the defendants on all counts.
 
 
 
 Notes:
 
 
 *
 Following oral argument, we deferred submission and encouraged the parties to settle. We asked the parties to notify us within 48 hours if negotiations were progressing and more time was needed. Having heard nothing by close of business on September 14, 2000, we ordered the case submitted.
 
 
 **
 The Honorable William W Schwarzer, United States Senior District Judge for the Northern District of California, sitting by designation.
 
 
 [1]
 Plaintiffs did not sue Horsley, but the district court concluded that Horsley was an agent of ACLA and other defendants as well as a coconspirator. See Planned Parenthood of the Columbia/Willamette, Inc. v. American Coalition of Life Activists, 41 F. Supp. 2d 1130, 1152 (D. Or. 1999). In addition, the court found that the defendants came up with the idea for the webpage and sent Horsley much of its content. See id. at 1152-53.
 
 
 [2]
 In addition to plaintiffs, the Nuremberg Files website identifies dozens of clinic employees and public figures as abortion supporters (and future war crimes defendants), including six current members of the Supreme Court, Bill Clinton, Al Gore, Janet Reno, Jack Kevorkian, C. Everett Koop, Mary Tyler Moore, Whoopi Goldberg and, for reasons unknown, Retired Justice Byron White. See Roe, 410 U.S. at 221 (White, J., dissenting).
 
 
 [3]
 Specifically, they alleged violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. S 1962, the Oregon Racketeer Influenced and Corrupt Organizations Act, Or. Rev. Stat. S 166.720, and the state tort of intentional infliction of emotional distress. The state law claims were abandoned before trial, and the district court submitted to the jury only the FACE and RICO claims.
 
 
 [4]
 We call statements "true threats" to distinguish them from statements that are threatening on their face but could only be understood, under the circumstances, as hyperbole or jokes. For example, in Watts v. United States, 394 U.S. 705 (1969) (per curiam), the Supreme Court held that the defendant's statement that "[i]f they ever make me carry a rifle the first man I want to get in my sights is L.B.J.," was not a true threat. Id. at 706, 708 (internal quotation marks and citation omitted). It was instead "political hyperbole . . . a kind of very crude offensive method of stating a political opposition to the President." Id. at 708 (internal quotation marks omitted).
 
 
 [5]
 The jury held that defendants Michael Bray and Donald Treshman were not liable under RICO. Although the district court had previously found Bray in default because of his refusal to comply with discovery orders, the court later set aside the default and entered judgment against Bray on the FACE claim based on the verdict.
 
 
 [6]
 In No. 99-35333, Paul deParrie, a non-party, moves to intervene in the appeal because he was enjoined as an employee and agent of one of the defendant organizations, the Advocates for Life Ministries (ALM). See Fed. R. Civ. P. 65(d). DeParrie relies on Keith v. Volpe, 118 F.3d 1386, 1391 (9th Cir. 1997), but that case dealt with a situation where a non-party sought to appeal a judgment that would not otherwise have been appealed by the parties. The question then was whether someone who is not a party might take the legally operative step of filing a notice of appeal. Here, all of the losing parties have appealed and deParrie's proposed participation is in the nature of an amicus. We therefore construe deParrie's motion as one to participate as an amicus curiae and grant it.
 In No. 99-35320 and No. 99-35405, a former defendant, Monica Migliorino Miller, filed a notice of appeal of the injunction with which the district court ordered she be served. At plaintiffs' request, the district court had dismissed Miller from the suit before trial and so she was not herself enjoined. The injunction applies to her only insofar as she is an agent or employee of defendants, and so she has no independent standing to appeal. Her notice of appeal is therefore ordered stricken.
 
 
 [7]
 If such statements were unprotected threats, newspapers might face liability for publishing stories that increased the likelihood that readerswould harm particular persons, for example by disclosing the identity of mobsters in hiding or convicted child molesters. This would permit the imposition of liability for the mere publication of news, dramatically undercutting the freedom constitutionally accorded to the press. Cf. New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964) (recognizing the need to protect our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open").
 
 
 [8]
 It is not unlawful to say things that frighten other people. A doctor who discloses an adverse prognosis often instills fear in the patient and his family; predicting a future event--"That bus is about to hit your child!"--can cause the listener intense apprehension. Yet such statements are not (and cannot be made) unlawful. Nor does it matter that the speaker makes the statement for the very purpose of causing fear. Let's say your malicious neighbor sees your house is burning. He calls you at work and announces: "Your house is on fire!" This may scare you--it may have no other purpose--yet it is lawful because it is speech and does not fall within one of the narrow categories the Supreme Court has held is unprotected under the First Amendment.
 The matter is more complicated where the speech is intended to intimidate the listener into changing his conduct. Blackmail and extortion--the threat that the speaker will say or do something unpleasant unless you take, or refrain from taking, certain actions--are not constitutionally protected. See, e.g., Watts, 394 U.S. 705. On the other hand, the statement, "If you smoke cigarettes you will die of lung cancer," is protected, even though its purpose is to scare you into quitting smoking. So is, "If you mess around with Tom's girlfriend, he'll break your legs," unless the speaker is sent by Tom. The difference is this: In the case of blackmail and extortion, you are given to understand that, unless you do what's asked of you, the speaker himself (or someone acting on his behalf) will bring about that which you abhor; in the other examples, the speaker has no control over the adverse consequences and merely predicts what is likely to happen if you act (or refrain from acting) in a particular way.
 
 
 [9]
 Our case law has not been entirely consistent as to whether a speaker may be penalized for negligently uttering a threat or whether he must have specifically intended to threaten. Compare Orozco-Santillan, 903 F.2d at 1265 ("Whether a particular statement may properly be considered to be a threat is governed by an objective standard--whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault."), with United States v. Gilbert (Gilbert I), 813 F.2d 1523, 1529 (9th Cir. 1987) ("[Gilbert] correctly identifies the element of intent specified in section 3631 as the determinative factor separating protected expression from unprotected criminal behavior . . . . [T]he statute's requirement of intent to intimidate serves to insulate the statute from unconstitutional application to protected speech. " (citation omitted)). While we believe that Gilbert I states the correct rule, the result here is the same under either standard. We therefore presume that the less speechprotective standard of Orozco-Santillan applies.
 
 
 [10]
 We need not decide here whether the First Amendment would protect defendants from a suit for invasion of privacy, because plaintiffs do not claim damages based solely on the publication of private facts, namely their addresses and telephone numbers. Cf. Anderson v. Fisher Broadcasting Cos., 712 P.2d 803, 807 (Or. 1986) (recognizing a tort for invasion of privacy when the tortfeasor has the specific intent to cause plaintiff severe mental or emotional distress and such conduct exceeds "the farthest reachof socially tolerable behavior").
 
 
 [11]
 See, e.g., Lovell, 90 F.3d at 369 (student told administrator, "I'm going to shoot you"); Melugin v. Hames, 38 F.3d 1478, 1481 (9th Cir. 1994) (civil defendant sent letter to judge threatening to kill him); OrozcoSantillan, 903 F.2d at 1264 (arrestee threatened INS agent at his arrest and during subsequent phone calls); United States v. Gilbert (Gilbert II), 884 F.2d 454, 455-56 (9th Cir. 1989) (white supremacist mailed a letter to the head of an inter-racial adoption agency, condemning her occupation and enclosing posters suggesting he would commit violence against interracial couples and ethnic minorities); United States v. Mitchell, 812 F.2d 1250, 1252 (9th Cir. 1987) (defendant told Secret Service agents he was going to kill them and the President); Roy v. United States, 416 F.2d 874, 875 (9th Cir. 1969) (marine called the White House and said he was going to kill the President). The instruction continues to be good law in cases where the source of the threatened violence is not an issue.
 
 
 [12]
 In December 1994, John Salvi killed two clinic workers and wounded five others in attacks on two clinics in Brookline, Massachusetts; Salvi later fired shots at a clinic in Norfolk, Virginia before he was apprehended. Salvi is not a defendant in this case.
 
 
 [13]
 See, e.g., Orozco-Santillan, 903 F.2d at 1265 ("Alleged threats should be considered in light of their entire factual context, including the surrounding events and reaction of the listeners."); Gilbert II, 884 F.2d at 457 ("The fact that a threat is subtle does not make it less of a threat."). Other courts have also recognized that ambiguous language may still constitute a threat. See United States v. Dinwiddie , 76 F.3d 913, 925 (8th Cir. 1996) (holding that an anti-abortion activist, who had previously used force against clinic personnel, threatened Dr. Crist when she screamed at him on numerous occasions that he could be killed if he kept on committing abortions); United States v. Malik, 16 F.3d 45, 49 (2d Cir. 1994) (finding a threat where defendant sent letters to a federal appellate judge suggesting he would use force against the panel unless it reversed its decision); United States v. Khorrami, 895 F.2d 1186, 1193 (7th Cir. 1990) (holding that defendant made a threat by repeatedly making anti-Semitic phone calls to a Jewish organization and sending it letters calling for the deaths of Israeli leaders).
 
 
 [14]
 The defendants come closest to suggesting violence on the webpage, where the names of the murdered doctors are stricken and the wounded ones are grayed. We read the striketype and graying as the equivalent of marking "killed" or "wounded" next to the names. This clearly reports past violent acts and may connote approval. But it cannot fairly be read as calling for future violence against the several hundred other doctors, politicians, judges and celebrities on the list; otherwise any statement approving past violence could automatically be construed as calling for future violence.
 
 
 [15]
 Defendants objected to admission of much of this evidence and press their objections on appeal. Given our ruling on the merits, we need not pass on this issue. Nothing we say, therefore, should be construed as approving the district court's evidentiary rulings.
 
 
 [16]
 The doctors do not claim that ACLA's speech amounted to incitement. To rise to incitement, the speech must be capable of "producingimminent lawless action." Brandenburg, 395 U.S. at 447. Here, the statements were made at public rallies, far away from the doctors, and before an audience that included members of the press. ACLA offered rewards to those who stopped the doctors at "some indefinite future time," Hess, 414 U.S. at 108, and the ambiguous message was hardly what one would say to incite others to immediately break the law. Finally, the statements were not in fact followed by acts of violence. See Claiborne Hardware, 458 U.S. at 928 ("[H]ad [the speech] been followed by acts of violence, a substantial question would be presented" as to incitement, but "[w]hen such appeals do not incite lawless action, they must be regarded as protected speech.").
 
 
 [17]
 We cannot distinguish this case from Claiborne Hardware on the ground that the speech is aimed at impeding abortions, which are constitutionally protected against government interference. The speech in Claiborne Hardware likewise sought to prevent lawful conduct--black citizens' patronage of white stores--that the government could not ban without violating the Equal Protection Clause. The Constitution protects rights against government interference; it doesn't justify the suppression of private speech that tries to deter people from exercising those rights.
 
 
 [18]
 For precisely the same reasons, the district court could not enjoin the defendants based upon such protected statements. We must therefore vacate the injunction as well.