STATE of Wisconsin, Plaintiff-Respondent,

v.

Murle E. PERKINS, III, Defendant-Appellant-Petitioner.

Supreme Court

*No. 99–1924–CR. Oral argument December 1, 2000.—Decided May 16, 2001.*

2001 WI 46

(Also reported in 626 N.W.2d 762.)

143

For the defendant-appellant-petitioner there were briefs and oral argument by *William E. Schmaal*, assistant state public defender.

For the plaintiff-respondent the cause was argued by *Thomas J. Balistreri*, assistant attorney general, with whom on the brief was *James E. Doyle*, attorney general.

¶ 1. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE. This is a review of a published decision of the court of appeals, *State v. Murle E. Perkins, III*, 2000 WI App 137, 237 Wis. 2d 313, 614 N.W.2d 25, affirming an order of the Circuit Court for Jackson County, Michael McAlpine, Circuit Court Judge. The circuit court order denied the motion of the defendant, Murle E. Perkins III, for postconviction relief from a conviction for threatening a judge in violation of Wis. Stat. § 940.203(2) (1997–98).[1]

¶ 2. The question of law presented in this case is whether a new trial should be granted because the jury instruction relating to the crime of threatening a judge

---

[1] All subsequent references to the Wisconsin Statutes are to the 1997–98 version unless otherwise noted.

failed to shield the defendant from a conviction based on constitutionally protected speech.[2] We conclude that the jury instruction in this case was inadequate. The real controversy in this case has not been fully tried and the defendant is entitled to a new trial. We therefore reverse the decision of the court of appeals and remand the cause for further proceedings not inconsistent with this opinion.

I

¶ 3. The facts of this case, although somewhat conflicting, are set forth below. On March 25, 1998, after spending the afternoon in a bar, the defendant called his sister-in-law, Peggy Perkins, to ask for a ride home. Ms. Perkins testified that the defendant was intoxicated and depressed because he had recently broken up with his girlfriend and he missed his children. Ms. Perkins drove the defendant to the residence of his parents, who were out of town. Ms. Perkins then returned to her nearby home.

¶ 4. A few hours later, Ms. Perkins heard a loud bang that sounded like a gunshot coming from the parents' residence. She called the defendant to see if he was all right, and he laughed and told her, "I haven't killed myself yet." She then visited the defendant and

[2] U.S. Const. amend. I; Wis. Const. art. I, § 3.

We determine this question of law independently of the circuit court and court of appeals, benefiting from their analyses.

The defendant raises two other issues that we need not and do not address here: (1) whether the evidence is sufficient to support the conviction, and (2) whether his attorney's failure to stipulate to his prior felony convictions, as allowed by *State v. McAllister*, 153 Wis. 2d 523, 451 N.W.2d 764 (Ct. App. 1989), constitutes ineffective assistance of counsel.

found him calm, but still intoxicated and depressed. The defendant told her that he would call the police before killing himself so that the police could remove his body before his parents arrived home.

¶ 5. Additional testimony from friends of the defendant established that he had called at least one friend that evening to say good-bye. One of these friends contacted the police, who visited the parents' residence, where they found the defendant and his sister-in-law.

¶ 6. One of the police officers testified at trial regarding his ensuing thirty-minute conversation with the defendant. During the course of this conversation, the defendant appeared to him to be intoxicated and depressed, but calm. According to the officer, the defendant stated that he had fired a gun that evening in the hopes that someone would come to talk to him. The defendant said he was thinking about killing himself, but that he did not have a specific plan. The officer asked the defendant what he would use if he were going to kill himself; the defendant grinned and said that he would use a shoestring. Later in the conversation, the defendant stated that if he were going to kill himself, it would be easy, and gestured toward a gun cabinet belonging to his parents.

¶ 7. The officer continued to question the defendant, and the defendant eventually stated that if he were going to kill himself, he would first kill Judge Robert W. Radcliffe, whom he referred to as a "brain-dead son-of-a-bitch." It was established at trial that Judge Radcliffe had recently held a contempt hearing in which the defendant had been ordered to pay $50,000 in overdue child support.

¶ 8. According to the testimony at trial, the conversation between the officer and the defendant

continued calmly for several more minutes, when the officer decided to take the defendant to a hospital under an emergency chapter 51 detention. The officer believed that the defendant "was possibly a danger to himself and possibly others."

¶ 9. The defendant was later charged with one count of threatening a judge in violation of Wis. Stat. § 940.203(2).[3] At trial, the defendant's mother testified that the defendant did not have access to the guns in the locked gun cabinet. The defendant testified that he had not shot a gun that evening, but rather had set off a large firecracker. The defendant also testified that his statement regarding Judge Radcliffe was intended as a hypothetical to show that he had no intention of killing himself. The defendant denied that he had intended to threaten or harm Judge Radcliffe.

¶ 10. At the close of the evidence, the jury instructions included an instruction in accordance with Wisconsin Jury Instructions—Criminal 1240, Battery or Threat to a Judge, § 940.203. The defendant did not object to this instruction. The jury returned a verdict of

---

[3] Wisconsin Stat. § 940.203(2) provides as follows:

Whoever intentionally causes bodily harm or threatens to cause bodily harm to the person or family member of any judge under all of the following circumstances is guilty of a Class D felony:

(a) At the time of the act or threat, the actor knows or should have known that the victim is a judge or member of his or her family.

(b) The judge is acting in an official capacity at the time of the act or threat or the act or threat is in response to any action taken in an official capacity.

(c) There is no consent by the person harmed or threatened.

The defendant was also charged with one count of using a firearm while intoxicated, and one count of being a felon in possession of a firearm. The jury acquitted him of these two weapons charges, and they are not at issue in this review.

guilty on the count of intentional threat to a judge. The defendant filed a motion for postconviction relief, which the circuit court denied. The court of appeals affirmed the order of the circuit court.

## II

¶ 11. The State argues that the defendant has waived the right to seek review of any error in the jury instructions because the defendant failed to object to the jury instructions at trial. Wisconsin Stat. § 805.13(3) provides that "[f]ailure to object at the conference [about jury instructions] constitutes a waiver of any error in the proposed instructions or verdict."[4]

¶ 12. We agree with the State that the defendant has waived his right of review of any allegedly erroneous jury instruction. Nevertheless, this court may reverse a conviction based on a jury instruction regardless of whether an objection was made, when the instruction obfuscates the real issue or arguably caused the real controversy not to be fully tried. Reversal is available under Wis. Stat. § 751.06 at the discretion of this court.[5]

---

[4] Wisconsin Stat. § 972.11(1) makes § 805.13(3) applicable to criminal proceedings.

[5] *Vollmer v. Luety*, 156 Wis. 2d 1, 22, 456 N.W.2d 797 (1990).

Wisconsin Stat. § 751.06, entitled "Discretionary reversal," provides as follows:

In an appeal in the supreme court, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record, and may direct the entry of the proper judgment or remit the case to the trial court for the entry of the proper judgment or for a new trial, and direct

¶ 13. Along with this statutory authority to reverse a judgment on the basis of a waived error, this court has the inherent authority to review a waived error. In previous cases addressing this inherent authority to review a waived error, we have noted that this court "undoubtedly has the power, but ordinarily will not exercise it. The question is one of administration, not of power."[6] When we review an alleged error under our inherent authority, "we do so because the alleged error in issue has some substantial significance in our institutional law-making responsibility as set forth in the statute and constitution."[7]

¶ 14. The alleged error in this case—in the jury instruction relating to the crime of threatening a judge—has substantial significance in our body of statutory and constitutional law. Furthermore, if the jury instruction was erroneous, it is probable that the "instruction obfuscate[d] the real issue or arguably caused the real issue not to be tried [and] reversal would be available in the discretion" of this court.[8] We consequently conclude that this court should exercise its discretion to review the jury instruction relating to the elements of the crime of threatening a judge to determine whether the jury instruction is consistent with the constitutional right to freedom of speech.

the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice.

[6] *Vollmer*, 156 Wis. 2d at 12 (quoting *Cappon v. O'Day*, 165 Wis. 486, 491, 162 N.W. 655 (1917)).

[7] *Vollmer*, 156 Wis. 2d at 14. *See also State v. Schumacher*, 144 Wis. 2d 388, 404–07, 410, 424 N.W.2d 672 (1988).

[8] *Vollmer*, 156 Wis. 2d at 22.

¶ 15. We therefore exercise our discretion to review the merits of the defendant's objections to the jury instruction.

### III

¶ 16. We begin our review of the jury instruction given in this case on the elements of the crime of threatening a judge by examining the First Amendment case law relating to statutes criminalizing threats to persons.

¶ 17. This court agrees with the State and the defendant that some threatening words are protected speech under the First Amendment. Only a "true threat" is constitutionally punishable under statutes criminalizing threats. The phrase "true threat" is a term of art used by courts to refer to threatening language that is not protected by the First Amendment.

¶ 18. In *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992), the U.S. Supreme Court offered three rationales for denying First Amendment protection to threats of violence: "protecting individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur." The leading case distinguishing between punishable and protected threatening speech is *Watts v. United States*, 394 U.S. 705 (1969). In that case the U.S. Supreme Court reviewed Watts's conviction for violating a federal statute proscribing threats against the president of the United States. Watts was convicted for "threatening" President Lyndon Johnson at an antiwar rally, where he said:

> They always holler at us to get an education. And now I have already received my draft classification as 1-A and I have got to report for my physical this Monday coming. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J.

*Watts*, 394 U.S. at 706.

¶ 19. In reversing the defendant's conviction for threatening the president, the U.S. Supreme Court evaluated the federal anti-threat statute in light of the First Amendment rights at stake. The Court determined that the statute was constitutional given the "valid, even. . .overwhelming, interest in protecting" the president. *Watts*, 394 U.S. at 707. However, despite the strength of this interest, the Court held that a statute criminalizing "pure speech" must distinguish between "true threats" and constitutionally protected speech. *Id.*

¶ 20. In *Watts*, the Court concluded that Watts's statement was not a true threat but rather "political hyperbole." *Watts*, 394 U.S. at 708. Thus, Watts's only offense was "a kind of very crude offensive method of stating a political opposition to the President." *Id.*

¶ 21. The *Watts* court imposed a clear constitutional limit on the government's ability to punish threatening speech. *Watts* did not, however, "fashion a bright-line test for distinguishing a true threat from protected speech."[9]

¶ 22. As a result, federal and state courts that have considered the issue of threatening speech have apparently created several tests to discern whether threatening language constitutes protected or unprotected speech. The tests are an attempt to balance

---

[9] *See United States v. Francis*, 164 F.3d 120, 122 (2d Cir. 1999).

freedom of speech with the public interest in prohibiting threatening statements that cause substantial harm by instilling fear.[10]

¶ 23. The Second Circuit Court of Appeals wrote that a "true threat" must be "on its face and in the circumstances in which it is made so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." *United States v. Kelner*, 534 F. 2d 1020, 1027 (2d Cir. 1976).[11] In contrast to the

[10] For discussions of the true threat doctrine and the various tests applied by the federal and state courts, see Steven G. Gey, *The Nuremberg Files and the First Amendment Value of Threats*, 78 Tex. L. Rev. 541 (2000); John Rothchild, *Menacing Speech and the First Amendment: A Functional Approach to Incitement that Threatens*, 8 Tex. J. Women & L. 207 (1999); Robert Kurman Kelner, *Note: United States v. Jake Baker: Revisiting Threats and the First Amendment*, 84 Va. L. Rev. 287 (1998); Leigh Noffsinger, *Notes & Comments: Wanted Posters, Bullet Proof Vests, and the First Amendment: Distinguishing True Threats from Coercive Political Advocacy*, 74 Wash. L. Rev. 1209 (1999); David C. Potter, *Note: The Jake Baker Case: True Threats and New Technology*, 79 B.U. L. Rev. 779 (1999); *Recent Case: United States v. Fulmer, 108 F.3d 1486 (1st Cir. 1997)*, 111 Harv. L. Rev. 1110 (1998); Anna S. Andrews, *When Is a Threat "Truly" a Threat Lacking First Amendment Protection? A Proposed True Threats Test to Safeguard Free Speech Rights in the Age of the Internet*, UCLA Online Inst. for Cyberspace L. & Pol'y (1999), at *http://www.gseis.ucla.edu/iclp/aandrews2.htm* (last visited April 24, 2001).

[11] *See also United States v. Crews*, 781 F.2d 826, 831–32 (10th Cir. 1986) (requiring a showing that a threat "according to [its] language and context conveyed a gravity of purpose and likelihood of execution so as to constitute speech beyond the pale of protected 'vehement, caustic. . .unpleasantly sharp attacks on government and public officials.' ") (quoting *United States v. Kelner*, 534 F. 2d 1020, 1026 (2d Cir. 1976)).

153

Second Circuit, other courts have said that the absence of explicitly threatening language does not preclude the finding of a threat and that a conditional threat is nonetheless a threat.[12]

¶ 24. Several courts have adopted an objective reasonable person standard to determine a "true threat." The objective standard asks whether the statement could reasonably be interpreted as a serious expression of an intention to inflict bodily harm. The federal and state cases applying an objective standard are, however, divided about whether to focus the test for reasonableness on the person who makes the threatening statement, the person who hears the threatening statement, or both.[13]

¶ 25. For example, some courts approach the objective standard from the perspective of the speaker, asking whether the statement was made "in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm upon or take the life of [another]."[14]

---

[12] *United States v. Fulmer*, 108 F.3d 1486, 1492 (1st Cir. 1997); *United States v. Malik*, 16 F.3d 45, 49 (2d Cir. 1994); *United States v. Schneider*, 910 F.2d 1569, 1570 (7th Cir. 1990).

[13] *See, e.g., United States v. Saunders*, 166 F.3d 907, 913 n.6 (7th Cir. 1999), and *Fulmer*, 108 F.3d at 1491–92 (noting agreement among federal circuit courts of appeal that an objective test be employed to determine whether a statement is a true threat, but disagreement among those courts regarding whether the test should be speaker- or listener-based).

[14] *United States v. Hoffman*, 806 F.2d 703, 707 (7th Cir. 1986) (quoting *Roy v. United States*, 416 F.2d 874, 877 (9th Cir. 1969)). For other courts applying this test, see, for example, *Fulmer*, 108 F.3d at 1492 (test focuses on "what the defendant reasonably should have foreseen"); *Saunders*, 166 F.3d at 912

The First Circuit Court of Appeals adopted this speaker-based objective standard, reasoning that it is untenable to apply a standard guided from the perspective of a listener because a defendant might be convicted for making an ambiguous statement that a listener might find threatening because of events not within the knowledge of the defendant.[15] *United States v. Fulmer*, 108 F.3d 1486, 1491 (1st Cir. 1997).

¶ 26. One question raised by the speaker-based objective standard is whether the reference to "those to whom the maker communicates the statement" contemplates the subjective view of an actual listener or the objective view of a reasonable listener. Language in some opinions adopting the speaker-based objective standard indicates that the likely effect on the listener is judged from the standpoint of a reasonable listener.[16]

---

(test is whether "statement was made 'in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates a statement as a serious expression of an intention to inflict bodily harm' ") (quoting *United States v. Khorrami*, 895 F.2d 1186, 1192 (7th Cir. 1990), *cert. denied*, 498 U.S. 986 (1990)); *United States v. Orozco-Santillan*, 903 F.2d 1262, 1265 (9th Cir. 1990) (test is "whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm").

[15] The listener might be the victim of a threat or another recipient of the communication. In this case, for example, the victim of the threat was Judge Radcliffe. But the listener, the recipient of the communication, was the police officer.

[16] The Seventh Circuit treats both the listener's response to a statement and the listener's belief that it was a threat as relevant evidence, even though the standard is what a person making the statement should have reasonably foreseen. *Saun-*

¶ 27. In contrast to the jurisdictions using a speaker-based objective standard, which may or may not implicitly incorporate the view of a reasonable listener, other jurisdictions appear to approach the objective standard explicitly from the standpoint of the listener only, requiring that "[t]he prohibited statements must be understandable as a threat by a reasonable person of ordinary intelligence."[17] A benefit

---

*ders,* 166 F.3d at 913–14. The Seventh Circuit explained in *Khorrami,* 895 F.2d at 1192, that the listener is viewed as "a reasonable recipient, familiar with the context of the communication."

In *Schneider,* 910 F.2d at 1570–71, the Seventh Circuit stated the following:

> The test for whether a statement *is* a threat is an objective one; it is not what the defendant intended but whether the recipient could reasonably have regarded the defendant's statement as a threat. . . .The fact that the victim acts as if he believed the threat is evidence that he did believe it, and the fact that he believed it is evidence that it could reasonably be believed and therefore that it *is* a threat. (Emphasis in original.)

[17] *Iowa v. Milner,* 571 N.W.2d 7, 10 (Iowa 1997). *See also Malik,* 16 F.3d at 49 ("The test is an objective one—namely, whether 'an ordinary reasonable recipient who is familiar with the context of the letter would interpret it as a threat of injury.' ") (quoting *United States v. Maisonet,* 484 F.2d 1356, 1358 (4th Cir. 1973), *cert. denied,* 415 U.S. 933 (1974)); *United States v. Hart,* 212 F.3d 1067, 1071 (8th Cir. 2000) ("To determine 'whether a true threat exists, a court must. . .determine whether the recipient of the alleged threat could reasonably conclude that it expresses a determination or intent to injure presently or in the future.' ") (quoting *United States v. Dinwiddie,* 76 F.3d 913, 925 (8th Cir. 1996) (cert. denied, 519 U.S. 1043 (1996)); *United States v. Viefhaus,* 168 F.3d 392, 396 (10th Cir. 1999) ("The question is whether those who hear or read the threat reasonably consider that an actual threat has been made.").

of this listener-based objective standard is that it explicitly states that the determination of whether the language is a true threat does not involve the reaction of a uniquely sensitive person or a person whose reaction is based on special information not available to the defendant.[18]

¶ 28. Finally, at least one jurisdiction apparently incorporates both speaker- and listener-based elements of reasonableness, holding that a true threat exists when "a reasonable person would foresee that an objective rational recipient of the statement would interpret its language to constitute a serious expression of intent to harm."[19] This standard requires that a reasonable person uttering the statement would foresee that a reasonable person listening to the statement would interpret the statement as a serious expression of an intent to harm. The benefit of this standard is that it considers the standpoint of both a reasonable

---

[18] *See, e.g.*, Anna S. Andrews, *When Is a Threat "Truly" a Threat Lacking First Amendment Protection? A Proposed True Threats Test to Safeguard Free Speech Rights in the Age of the Internet*, UCLA Online Inst. for Cyberspace L. & Pol'y 11 (1999), at *http://www.gseis.ucla.edu/iclp/aandrews2.htm* (arguing that a standard that considers the particular sensitivities of the listener is underprotective of free speech).

One commentator takes this approach a step further, arguing that evidence of the listener's subjective response should be barred under the reasonable listener standard in order to prevent convictions based on a listener's unique sensitivity. *See Recent Case: United States v. Fulmer, 108 F.3d 1486 (1st Cir. 1997)*, 111 Harv. L. Rev. 1110, 1113 (1998) ("This evidence [of the actual listener's reaction] yields precisely the danger that the objective, speaker-based test seeks to avoid: namely, that a jury will consider a hearer's 'unique sensitivity.' ").

[19] *United States v. Miller*, 115 F.3d 361, 363 (6th Cir. 1997) (citations omitted).

speaker and a reasonable listener, which seems the best approach to evaluating the nature of a communication.

¶ 29. This court has considered these cases and concludes that the test for a true threat that appropriately balances free speech and the need to proscribe unprotected speech is an objective standard from the perspectives of both the speaker and listener. A true threat is determined using an objective reasonable person standard.[20] A true threat is a statement that a speaker would reasonably foresee that a listener would reasonably interpret as a serious expression of a purpose to inflict harm, as distinguished from hyperbole, jest, innocuous talk, expressions of political views, or other similarly protected speech. It is not necessary that the speaker have the ability to carry out the threat. In determining whether a statement is a true

---

[20] One commentator has embraced a subjective standard as a necessary supplement to the objective standard in order to best protect free speech. *See, e.g.*, Anna S. Andrews, *When Is a Threat "Truly" a Threat Lacking First Amendment Protection? A Proposed True Threats Test to Safeguard Free Speech Rights in the Age of the Internet*, UCLA Online Inst. for Cyberspace L. & Pol'y 11 (1999), at *http:// www.gseis.ucla.edu/ iclp/aandrews2.htm* ("The subjective element, requiring that a speaker *intend* that his speech be taken as a threat, is what is missing from the tests currently followed by a majority of courts. This element is particularly important to protecting freedom of speech, as it insures that a person will not be prosecuted for speech that he or she did not intend to be taken as a threat.") (emphasis in original). In this case the sixth element of the crime of intentional threat to a judge requires a subjective intent.

threat, the totality of the circumstances must be considered.[21]

¶ 30. This test for a "true threat" may, of course, need modification to fit the particular statute that criminalizes threatening speech. In this case, for example, the harm threatened is bodily harm. Other statutes may criminalize speech that threatens different harms.

¶ 31. In applying the objective test we have set forth herein, the trier of fact should consider the full context of the statement, including all relevant factors that might affect how the statement could reasonably be interpreted.[22] For example, the Eighth Circuit's recent decision in *United States v. Hart*, 212 F.3d 1067 (8th Cir. 2000), set forth various factors for consideration in evaluating the circumstances of a threatening statement under the speaker- and listener-based objective test:

> [F]actors to be taken into consideration when making this determination [include]: how the recipient and other listeners reacted to the alleged threat,

---

[21] For application of this true threat test in prosecutions under the disorderly conduct statute, *see In the Interest of Douglas D.*, 2001 WI 47, ¶ 37, 243 Wis. 2d 204, 626 N.W.2d 725, and *In the Interest of A.S.*, 2001 WI 48, ¶ 23, 243 Wis. 2d 174, 626 N.W.2d 712.

[22] The Ninth Circuit has recently cautioned about the use of a background of violence to gauge whether a true threat has been made against abortion providers where the speech did not contain an explicit statement of violence and was not directly communicated to the intended victim. *See Planned Parenthood of Columbia/Willamette, Inc. v. American Coalition of Life Activists*, 244 F.3d 1007 (9th Cir. 2001).

whether the threat was conditional, whether it was communicated directly to its victim, whether the maker of the threat had made similar statements to the victim on other occasions, and whether the victim had reason to believe that the maker of the threat had a propensity to engage in violence.

*Hart*, 212 F.3d at 1071 (citation omitted).

## IV

¶ 32. We now turn to the jury instruction used in this case, to determine whether this instruction was sufficient for First Amendment purposes. The defendant argues that the jury instruction did not define the word "threat," that is, it did not adequately explain to the jury the difference between a "true threat" and protected free speech. Thus, argues the defendant, the conviction violated his right to free expression and his conviction is not constitutionally sound.

¶ 33. The jury instruction used in this case, patterned on Wisconsin Jury Instructions—Criminal 1240, explains that in order for the jury to render a guilty verdict it must find that six elements are present: (1) the defendant "threatened to cause bodily harm to" a person; (2) the threatened person "was a judge"; (3) the defendant "knew that [the threatened person] was a judge"; (4) the judge "was acting in an official capacity" or the threat "was in response to an action taken in the judge's official capacity"; (5) "the defendant threatened bodily harm without the consent of" the person threatened; and (6) "the defendant acted intentionally."

¶ 34. The jury in this case was instructed as follows:

Section 940.203 of the Criminal Code of Wisconsin, is violated by one who intentionally threatens to cause bodily harm to the person of any judge where at the time of the threat the person knows that the victim is a judge, the threat is in response to an action taken in the judge's official capacity, and there is no consent by the person threatened.

Before you may find the defendant guilty of this offense, the State must prove by evidence which satisfies you beyond a reasonable doubt that the following six elements were present.

The first element requires that the defendant threatened to cause bodily harm to Robert W. Radcliffe.

The second element requires that Robert Radcliffe was a judge.

A circuit court judge is a judge.

The third element requires that the defendant knew that Robert W. Radcliffe was a judge.

The fourth element requires that the threat was in response to an action taken in the judge's official capacity. The responsibilities of a judge include making a determination which results in the issuance of an Order regarding back child support.

The fifth element requires that the defendant threatened bodily harm without the consent of Robert W. Radcliffe. "Without consent" means that there was no consent in fact.

The sixth element requires that the defendant acted intentionally. This requires that the defendant acted with the mental purpose to threaten bodily harm to another human being.

You cannot look into a person's mind to find out intent. You may determine such intent directly or

161

indirectly from all the facts in evidence concerning this offense. You may consider any statements or conduct of the defendant which indicate state of mind. You may find intent to threaten bodily harm from such statements or conduct, but you are not required to do so. You are the sole judges of the facts, and you must not find the defendant guilty unless you are satisfied beyond a reasonable doubt that the defendant intended to threaten bodily harm.

If you are satisfied beyond a reasonable doubt that the defendant intentionally threatened to cause bodily harm to Robert W. Radcliffe, that the threat was in response to an action taken in the judge's official capacity, that the defendant knew that the victim was a judge, that Robert W. Radcliffe did not consent to the threatening of bodily harm, and that the defendant intended to threaten bodily harm to Robert W. Radcliffe, you should find the defendant guilty of the first count of the information.

If you are not so satisfied, you must find the defendant not guilty.

¶ 35. Two elements set forth in the jury instructions are relevant for the purposes of our discussion. Under the first element, the jury was required to find that the defendant threatened to cause bodily harm to Robert W. Radcliffe. No further instruction was given to tell the jury what language would be sufficient to find that the defendant "threatened to cause bodily harm."

¶ 36. Under the sixth element, the jury was required to find that the defendant acted intentionally. The jury was instructed with regard to the sixth element that acting intentionally meant that "the defendant acted with the mental purpose to threaten bodily harm to another human being." This instruction

told the jury to examine the subjective intent of the defendant.

¶ 37. Because the instructions did not define the first element, namely, whether the defendant "threatened to cause bodily harm," the jury was not instructed that it had to apply an objective test in the first element to determine whether the defendant had "threatened to cause bodily harm," that is, that a speaker would reasonably foresee that a listener would reasonably interpret the statement to be a serious expression of a purpose to inflict bodily harm, as distinguished from hyperbole, jest, innocuous talk, expressions of political views, or other similarly protected speech.

¶ 38. The State acknowledges that an objective standard is constitutionally required to define threat in order to criminalize only "true threats," that is, threats not constitutionally protected under the First Amendment. The State also concedes that the instruction given on the elements of the crime of intentional threat to a judge was not perfect and could be improved. The State urges, however, that the jury instruction in conjunction with other aspects of the trial was sufficient to ensure that the defendant's conviction was not based on protected speech.

¶ 39. The State offers several arguments to support its position. First, it asserts that the jury would have relied on the common understanding of the word "threat" as referring to an expression of intent to inflict injury, damage, or harm on another, as opposed to jest or hyperbole. Second, the State contends that the sixth element, requiring the jury to find that the defendant acted intentionally, means that the jury must have found that the defendant spoke with the mental purpose of expressing an intent to inflict bodily harm, as

opposed to hyperbole or jest. Third, the State argues that the testimony and closing arguments in this case adequately informed the jurors that they could convict the defendant only if they found that the defendant made a true threat to kill Judge Radcliffe.

¶ 40. We reject the State's argument that other aspects of the trial adequately informed the jury that it could convict the defendant only if it found that the defendant made a true threat. A proper jury instruction is a crucial component of the fact-finding process. *State v. Howard*, 211 Wis. 2d 269, 290, 564 N.W.2d 763 (1997). The validity of the jury's verdict depends on the completeness of the instructions. *State v. Dodson*, 219 Wis. 2d 65, 87, 580 N.W.2d 181 (1998).

¶ 41. Arguments by counsel cannot substitute for an instruction by the court. Arguments by counsel are likely to be viewed as statements of advocacy, whereas a jury instruction is a definitive and binding statement of law. Moreover, in this case, the jury was expressly instructed to base its verdict on the court's instructions rather than on the attorneys' arguments.[23]

¶ 42. Likewise, the defendant's testimony that he did not intend a threat cannot make up for the deficiency of the jury instruction. The defendant's testi-

---

[23] The instruction given to the jury, patterned on Wis JI—Criminal 160 (1999), entitled "Closing Arguments of Counsel," provides as follows:

> Consider carefully the closing arguments of the attorneys, but their arguments and conclusions and opinions are not evidence. Draw your own conclusions from the evidence, and decide upon your verdict according to the evidence, under the instructions given you by the court.

mony raised a factual dispute concerning his intent and his exact words to the officer.

¶ 43. We conclude that the testimony and closing arguments in this case were insufficient to overcome the deficiencies in the jury instruction on the elements of the crime of intentional threat to a judge. In this case the jury instruction was an incomplete statement of the law. The danger in this case is that the instruction gave the jury no definition of the essential element of a "threat" and that the jury may have used the common definition of "threat," thereby violating the defendant's constitutional right to freedom of speech. The common definition of threat is an expression of an intention to inflict injury on another. The definition of threat for the purposes of a statute criminalizing threatening language is much narrower. Therefore a reasonable likelihood exists that the jury interpreted and applied the instruction to the detriment of the defendant's constitutional right to freedom of speech.

¶ 44. We have no reason to believe that the jury would have added the necessary elements to the instruction it received on the elements of the crime of intentional threat to a judge and thus would have applied an interpretation of the statute that withstands constitutional scrutiny. If the jurors were following the jury instruction they would have concentrated simply on the subjective intent of the defendant to make the threatening statement and would have failed to consider whether a speaker would reasonably foresee that a listener would reasonably interpret the defendant's statement to be a serious expression of a purpose to inflict bodily harm, as distinguished from hyperbole, jest, expressions of political distaste, or other similarly protected speech.

¶ 45. Indeed, the jury instruction in this case stands in stark contrast to the suggested federal jury instruction for the federal crime of threatening the president, which sets forth a distinction between a true threat and protected speech.[24] The jury instruction used in this case also stands in stark contrast to the jury instructions provided in several of the true threat cases cited herein.[25] It is apparent from these cases that other jurisdictions provide an extensive jury instruction that follows·the test for a true threat applied in the respective jurisdiction.

¶ 46. For the reasons set forth, we conclude that the jury instruction on the elements of the crime of intentional threat to a judge should, to comply with constitutional requirements, contain a clear definition of a threat based on the true threat standard we set forth herein.

---

[24] The suggested instruction states inter alia: "A threat is an avowed present determination or intent to injure, at once or in the future. The mere hope, desire or wish to kill or to inflict harm upon the President is insufficient to constitute a threat. In order to find that the defendant threatened the President you must find that a reasonable person would have understood the defendant's statement as a serious expression of intent, determination, or purpose to harm the President. Even the crudest, most offensive methods of stating political opposition to the President are not threats." See Leonard B. Sand et al., 2 Modern Federal Jury Instructions 31–5 (1998).

[25] See, e.g., Fulmer, 108 F.3d at 1493–94; Malik, 16 F.3d at 51; Hoffman, 806 F.2d at 705–06.

See also Planned Parenthood, 244 F.3d at 1016–20 (jury instruction was insufficient because it allowed jurors to consider the violent acts of others in finding a true threat based on speech that did not contain an explicit statement of violence and was not directly communicated to the victims).

¶ 47. The defendant notes that this court must determine, as a matter of law, the sufficiency of the evidence to support conviction even if there are grounds to reverse the judgment of conviction and remand for a new trial. If the evidence is insufficient to sustain a conviction, the federal and state constitutional guarantees against double jeopardy may preclude remanding the case for a new trial.[26]

¶ 48. Courts have viewed the question whether an alleged statement constitutes a true threat, unprotected by the First Amendment, as an issue of fact for the fact finder unless a court can determine that the evidence is insufficient, as a matter of law, to support the defendant's conviction under the statute.[27] Reviewing the evidence presented to the jury in the light most favorable to sustaining the conviction, we conclude that a jury properly instructed could be convinced beyond a reasonable doubt that the State proved all the elements of the crime of intentional threat to a judge.

¶ 49. The deficiency in the jury instruction on the elements of the crime of intentional threat to a judge in the present case leads us to conclude that the controversy was not fully tried. Accordingly, pursuant to Wis. Stat. § 751.06, we reverse the decision of the court of appeals and the order of the circuit court and remand the cause to the circuit court for proceedings not inconsistent with this opinion.

*By the Court.*—The decision of the court of appeals is reversed and the cause remanded.

---

[26] *Burks v. United States*, 437 U.S. 1, 18 (1978); *State v. Hamilton*, 120 Wis. 2d 532, 540, 356 N.W.2d 169 (1984); *State v. Ivy*, 119 Wis. 2d 591, 610, 350 N.W.2d 622 (1984).

[27] *See, e.g., Viefhaus*, 168 F.3d at 397; *Miller*, 115 F.3d at 364; *Schneider*, 910 F.2d at 1570; *Khorrami*, 895 F.2d at 1192.

¶ 50. JON P. WILCOX, J. *(concurring)*. I concur with the majority. However, I write separately to underscore the constitutional framework that governs this review.

¶ 51. This case involves far more than the limits that the First Amendment of the United States Constitution and Article I, Section 3 of the Wisconsin Constitution place on the State's authority to punish speech. It also implicates the constitutional guarantees of due process and the right to a jury trial.

¶ 52. The Due Process Clause in the Fourteenth Amendment of the United States Constitution protects a criminal defendant "against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged."[1] *In re Winship*, 397 U.S. 358, 364 (1970). Closely tied to this guarantee is the right to a jury trial, embodied in the Jury Clauses of the Sixth Amendment of the United States Constitution[2] and Article I, Section 7 of the Wisconsin Constitution.[3] In combination,

---

[1] The Due Process Clause provides: "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

[2] The Jury Clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." The Fourteenth Amendment Due Process Clause protects this constitutional guarantee against infringement by the states. *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968).

[3] The Jury Clause of Article I, Section 7 provides: "In all criminal prosecutions [by indictment, or information,] the accused shall enjoy the right. . .to a speedy public trial by an impartial jury of the county or district wherein the offense shall have been committed." *See also* Wis. Stat. § 972.02(1) (1997–98) (codifying the right to a jury trial in criminal proceedings).

these constitutional protections ensure a criminal defendant the right to be free from conviction unless a *jury* finds beyond a reasonable doubt that he or she violated every element of the alleged offense. "Thus, although a judge may direct a verdict for the defendant if the evidence is legally insufficient to establish guilt, he [or she] may not direct a verdict for the State, no matter how overwhelming the evidence." *Sullivan v. Louisiana*, 508 U.S. 275, 277 (1993).

¶ 53. This right would ring hollow if courts were permitted to uphold convictions based on jury instructions that fail to set forth all the elements of the particular crime at issue. Courts instruct juries to decide cases based on the law set forth in the jury instructions. *See, e.g.*, Wis JI—Criminal 100 (Opening Instructions) ("[Y]ou must base your verdict on the law I give you in these instructions."). As this court has explained, "[p]roper jury instruction is a crucial component of the fact-finding process. The jury must determine guilt or guiltlessness in light of the jury charge, and the validity of that determination is dependent upon the correctness, and completeness of the instructions given." *State v. Howard*, 211 Wis. 2d 269, 290, 564 N.W.2d 753 (1997) (citation omitted). If a court fails to instruct the jury regarding a key element of the crime at issue, the court effectively removes that element from the jury's consideration. As to that element, then, the jury is precluded from deciding the defendant's guilt or innocence. *Id.* at 293. Accordingly, to uphold a conviction under such circumstances would be tantamount to directing a verdict in favor of the State on the omitted element: the court, not the jury, is

All future references to the Wisconsin Statutes are to the 1997–98 version unless otherwise indicated.

deciding guilt. Pursuant to the Due Process and Jury Clauses, such a result is strictly forbidden.

¶ 54. To be sure, error in jury instructions—even constitutional error—can be harmless. *Sullivan*, 508 U.S. at 278–81. Harmless error analysis, however, looks to the basis on which the jury rested its verdict. *Id.* at 279.

> The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered. . .was surely unattributable to the error. That must be so, because to hypothesize a guilty verdict that was never rendered—no matter how inescapable the findings to support that verdict might be—would violate the jury-trial guarantee.

*Id.*

¶ 55. As explained above, where jury instructions are devoid of explanation regarding an element of an alleged offense, the instructions effectively preclude the jury from rendering a verdict on that element. In such circumstances, there can be no jury verdict on that particular element and, therefore, harmless error analysis—which analyzes cases in terms of the jury verdict—is inapplicable. *Howard*, 211 Wis. 2d at 293; *see also State v. Avila*, 192 Wis. 2d 870, 893A, 532 N.W.2d 423 (1995) ("When a jury does not make a finding of guilty beyond a reasonable doubt on an element of the crime, a court cannot conclude that a deficient jury instruction with regard to that element is harmless error."). Accordingly, jury instructions that fail to set forth all the requisite elements of the charged offense always are grounds for reversal. *Howard*, 211 Wis. 2d at 293; *accord Sullivan*, 508 U.S. at 279

("Although most constitutional errors have been held amenable to harmless-error analysis, some will always invalidate the conviction.").

¶ 56. In the present case, Perkins was convicted for violating Wis. Stat. § 940.203(2) for allegedly threatening a judge. As the majority explains, pursuant to the First Amendment and Article I, Section 3 of the Wisconsin Constitution, the State may not convict a person for uttering threatening words unless that speech is a constitutionally unprotected "true threat." Majority op. at ¶ 17.[4] Thus, a key element to Perkins' alleged offense is that the speech at issue was a true threat.

¶ 57. However, the circuit court did not instruct the jury that, prior to returning a guilty verdict, it must find that Perkins' speech was a true threat. That is, the court failed to instruct the jury regarding a key element to Perkins' alleged offense. The jury consequently was entirely precluded from considering that element. Thus, Perkins' conviction does not rest upon a jury finding beyond a reasonable doubt that he violated every element of the alleged offense.

¶ 58. Indeed, Perkins may be guilty of violating § 940.203(2). The record seems to contain sufficient evidence to support a guilty verdict. However, it is not the province of this court to hypothesize a guilty verdict that, although possibly supported by the record, a jury never rendered. In light of the constitutionally deficient jury instructions at issue, if this court were to uphold Perkins' conviction, it in effect would be upholding a directed verdict in favor of the State on the issue

---

[4] The court further discusses this issue in two companion cases to the present case, also released today. *See State v. A.S.,* 2001 WI 48, ¶¶ 22–24, 243 Wis. 2d 173, 626 N.W.2d 712; *State v. Douglas D.,* 2001 WI 47, ¶ 31, 243 Wis. 2d 204, 626 N.W.2d 725.

of whether Perkins uttered a true threat. To do so would violate Perkins' constitutional rights to due process and a jury trial. For this reason, this court cannot uphold Perkins' conviction and must remand this case for a new trial.[5]

¶ 59. I am authorized to state that Justice N. PATRICK CROOKS joins this concurrence.

■

[5] As noted above, a court can determine that there is insufficient evidence to support a guilty verdict and, therefore, dismiss a case as a matter of law. *Sullivan v. Louisiana*, 508 U.S. 275, 277 (1993); *see also* majority op. at ¶¶ 47–48. However, such disposition would not be appropriate in the case at hand. Taking into account the substantial evidence which may support a jury finding that Perkins' speech was a true threat, this court must remand this case for a new trial. *See* majority op. at ¶¶ 48–49.