**COURT OF APPEALS
DECISION
DATED AND FILED**

**October 27, 2021**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.   2021AP218**

**STATE OF WISCONSIN**

Cir. Ct. No.  2018CV2074

**IN COURT OF APPEALS
DISTRICT II**

TOWN OF BROOKFIELD,

   PLAINTIFF-RESPONDENT,

 V.

MARTIN M. GONZALEZ,

   DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Waukesha County: LAURA F. LAU, Judge. *Reversed and cause remanded with directions*.

¶1     GUNDRUM, P.J.[1]   Martin M. Gonzalez appeals the circuit court's judgment convicting him of municipal disorderly conduct following a jury trial.

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(b) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

He contends he was unconstitutionally convicted for social media posts he made, claiming those posts did not constitute a "true threat" and thus are protected by the First Amendment. We agree with Gonzalez and reverse and remand to the circuit court to vacate his conviction.

### *Background*

¶2 The relevant testimony from the jury trial is as follows.

¶3 On January 2, 2018, Gonzalez had approximately 300 followers on his social media accounts. That evening, he posted a series of photos to his Instagram story. The first photo showed a ticket to the 10:00 p.m. showing of "Jumanji" at "Majestic of Brookfield" and included the statement "[h]ave to wait till 10" with a smiley-face emoji. The second photo, which the photo itself and trial testimony indicate was posted to Instagram shortly after the first photo, included numerous loose bullets and a hand holding a loaded magazine. The third photo on Gonzalez's Instagram story was of the inside of a darkened movie theater.

¶4 Garrett Bartelt, an acquaintance of Gonzalez's from their youth, happened to be at the same 10:00 p.m. showing of Jumanji at the Majestic Cinema. According to Bartelt's testimony, shortly before the start of the movie, by "happenstance"/"randomly," he "managed to come across" Gonzalez's Instagram story and saw these three photos. He added that the backs of his head and his friends' heads were visible in the third photo, but he acknowledged that he had no idea Gonzalez was going to be in the theater that night, that Gonzalez would not have known that he (Bartelt) was going to be in the theater that night, and that Gonzalez would not have been "directing" these social media posts at him.

¶5    Bartelt then went to Gonzalez's Snapchat account and observed there a photo that included a hand holding a handgun, with a loaded magazine nearby. This Snapchat photo was posted around the same time as the Instagram photos of the movie ticket and the loaded magazine and loose bullets.

¶6    When Bartelt saw these photos, he was "troubled," adding "[t]he fact that you could see my friends and I in the very last picture obviously was quite jarring …. [M]y friends and I were worried about our safety and the safety of those around us." Bartelt showed the photos to a friend sitting with him who "didn't have much of a reaction verbally," but, according to Bartelt, "was quite scared as well" upon seeing them. Bartelt and his friends left the theater and informed a security guard at Majestic Cinema of their concerns because "on the off chance that something actually does happen, there is a disturbance or violence that occurs and we had prior knowledge about being able to leave …. I would feel horrendous if something were to have happened [to others at the theater] and they didn't have that prior knowledge." Bartelt further testified that based on what he had seen on Gonzalez's stories, he thought "there was a chance there would be" a shooting in the theater that evening.

¶7    Majestic Cinema personnel contacted the police, who responded and executed a plan to detain Gonzalez, which included having the lights turned on and the movie turned off in the theater as officers, armed with shields and drawn guns, approached Gonzalez and ultimately handcuffed and detained him and a friend with him. One of the officers testified that Gonzalez had a look of surprise on his face. The police searched Gonzalez and his friend but found no weapons.

¶8 As indicated, Gonzalez was ultimately charged by the Town with a municipal violation of disorderly conduct. Following his conviction by a jury, he now appeals.

### *Discussion*

¶9 Gonzalez challenges the constitutionality of the disorderly conduct statute, WIS. STAT. § 947.01, and related municipal ordinance as applied to him in this case. He and the Town both boil down the primary question on appeal to whether his social media posts constituted a "true threat," as that term is understood in Wisconsin law, and thus are not entitled to the First Amendment protection they otherwise would have.[2] Gonzalez insists his posts did not constitute a true threat, and thus he could not be convicted for posting them. We agree.

¶10 Whether a statute has been unconstitutionally applied is a question of law we review de novo. *State v. Pocian*, 2012 WI App 58, ¶6, 341 Wis. 2d 380, 814 N.W.2d 894.

¶11 "[S]tates cannot enact general laws prohibiting all 'threats' without infringing on some speech protected by the First Amendment." *State v. Douglas D.*, 2001 WI 47, ¶31, 243 Wis. 2d 204, 626 N.W.2d 725. States may, however, "consistent with the First Amendment, prohibit all 'true threats.'" *Id.* "True threat" "is a constitutional term of art used to describe a specific category of unprotected speech." *Id.*

---

[2] The Town appears to concede on appeal that Gonzalez's posts constituted speech protected by the First Amendment if the posts do not constitute a "true threat" under controlling case law.

¶12 While "[t]he question of whether particular conduct constitutes a true threat is an issue of fact, typically best left for the finder of fact, ... if the conduct unquestionably is protected by the First Amendment, a court may dismiss the charge as a matter of law." *Id.*, ¶33. As our supreme court has defined it, a true threat is a statement that

> in light of all the surrounding circumstances, a speaker would reasonably foresee that a listener would reasonably interpret as a serious expression of a purpose to inflict harm, as distinguished from hyperbole, jest, innocuous talk, expressions of political views, or other similarly protected speech. It is not necessary that the speaker have the ability to carry out the threat.

*Id.*, ¶34 (footnote omitted; quoting *State v. Perkins*, 2001 WI 46, ¶29, 243 Wis. 2d 141, 626 N.W.2d 762). The *Douglas D.* court added that "[s]ome factors that courts and juries should consider when applying this test include, but are not limited to:

> how the recipient and other listeners reacted to the alleged threat, whether the threat was conditional, whether [the threat] was communicated directly to its victim, whether the maker of the threat had made similar statements to the victim on other occasions, and whether the victim had reason to believe that the maker of the threat had a propensity to engage in violence."

*Id.* (footnote omitted; citation omitted).[3] Applying these factors compels us to the conclusion that Gonzalez's posts did not constitute a true threat.

---

[3] In this case, the fact finder was a jury. Because Gonzalez did not raise before the circuit court, or us, an issue with regard to the adequacy of the jury instructions, our decision is not based on a consideration of those instructions. That said, it is more difficult for a court on review to defer to a jury's determination as to whether particular conduct constitutes a true threat where the instructions presented to the jury are in question. Here, in regard to whether Gonzalez's posts constituted a true threat and thus are not protected by the First Amendment, the circuit court instructed the jury:

(continued)

> A threat is an expression of intention to do harm and may be communicated orally, in writing, or by conduct. This requires a true threat. True threat means that a reasonable person making the threat would foresee that a reasonable person would interpret the threat as a serious expression of *intent* to do harm. It is not necessary that the person making the threat have the ability to carry out the threat. You must consider all the circumstances in determining whether a threat is a true threat.

(Emphasis added.)

On its face, this instruction raises questions. First, **State v. Perkins**, 2001 WI 46, ¶29, 243 Wis. 2d 141, 626 N.W.2d 762, and related cases state that the question is whether "a speaker would reasonably foresee that a listener would reasonably interpret [the challenged speech] as a serious expression of a *purpose* to inflict harm, as distinguished from hyperbole, jest, innocuous talk, expressions of political views, or other similarly protected speech." (Emphasis added.) It cannot be assumed that jurors would interpret "a serious expression of *intent* to do harm," as the circuit court here instructed the jury, as being the same as "a serious expression of a *purpose* to inflict harm," which is the actual language **Perkins** directs. *See id.* (emphasis added); *see also* **State v. Mitchell**, 169 Wis. 2d 153, 167 n.11, 485 N.W.2d 807 (1992), *rev'd sub nom.* **Wisconsin v. Mitchell**, 508 U.S. 476 (1993) (recognizing that although "'[m]otive,' 'intent,' and 'purpose' are related concepts in that they all refer to thought processes[,] [t]hey are legally distinct in crucial respects." (citation omitted)); *compare Purpose*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "purpose" as "[a]n objective, goal, or end; specif., the business activity that a corporation is chartered to engage in"), *with Intent*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "intent" as "[t]he state of mind accompanying an act, esp. a forbidden act" and "general intent" as "[t]he intent to perform an act even though the actor does not desire the consequences that result").

Second, the instruction does not inform the jury that it must actually find that Gonzalez's posts constituted a true threat in order to find him guilty of disorderly conduct. Lastly, the instruction completely omits the factors that our supreme has stated a jury "should consider" when determining whether speech, such as Gonzalez's posts, constitute a true threat—those being

> how the recipient and other listeners reacted to the alleged threat, whether the threat was conditional, whether it was communicated directly to its victim, whether the maker of the threat had made similar statements to the victim on other occasions, and whether the victim had reason to believe that the maker of the threat had a propensity to engage in violence.

**Perkins**, 243 Wis. 2d 141, ¶31 (citation omitted). For these reasons, one would be hard-pressed to conclude that the jury actually made a finding consistent with **Perkins** and related cases that Gonzalez's speech constituted a true threat.

6

¶13     As to the first factor, we agree that Bartelt reacted to the posts with alarm and concern for his safety and that of his friends and other moviegoers. When shown all the posts together, others who viewed them also believed there to be reason to take action and ultimately detain Gonzalez.  We note, however, that there was no evidence presented that the posts raised any sense of alarm in any of Gonzalez's 299 other social media followers, and we have no reason to believe that if Bartelt had been fifteen miles away at a Bucks game when he viewed the posts that night—instead of coincidentally being in the same theater as Gonzalez—that it would have raised any sense of alarm or caused him to take any action at all.[4]     Indeed, we suspect it unlikely that except for the extreme coincidence that Bartelt happened to be at the same showing of Jumanji as Gonzalez that evening and by "happenstance" checked Gonzalez's Instagram story and then Gonzalez's Snapchat—a completely separate social media platform from Instagram—and observed the post of a handgun with a loaded magazine nearby, that anything would ever have come from these posts.

---

[4] The Town claims Gonzalez's "conduct is not protected by the First Amendment" because it was the equivalent of "falsely shouting fire in a theater and causing a panic."  *See* *Schenck v. United States*, 249 U.S. 47, 52 (1919) ("The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic.").  We see significant differences.  In the circumstance of a person yelling "fire" in a theater, it is not only reasonably foreseeable, but indeed quite likely, that doing so would cause an immediate stampede for the exits resulting in injury or loss of life to one or more persons.  In this case, there is no evidence suggesting that Gonzalez had any reason to believe that even one of his 300 social media followers would not only see his posts on *both* Instagram and Snapchat around the time of this movie, but would also just happen to be in the theater at that time for the same showing.  Certainly no reasonable person in Gonzalez's position would have had reason to believe multiple people in the theater might see the posts and create a stampede for the exits (which obviously did not happen in this case).  We note that as opposed to the immediate reaction of yelling "fire" in a theater, in this case Gonzalez's final post was posted and viewed by Bartelt more than an hour before the police even arrived inside the theater to detain Gonzalez.

7

¶14    As to the factor examining "whether the threat was conditional," it really has limited, if any, bearing on this case as no words were used at all that could create a conditional-threat situation.

¶15    We also consider whether "[the threat] was communicated directly to its victim." ***Douglas D.***, 243 Wis. 2d 204, ¶34 (citation omitted).  We note that if the posts here amounted to a threat at all, the "victim" of the threat would have been anybody who happened to be at the 10:00 p.m. showing of Jumanji at the Majestic Cinema that night.  The evidence established that Bartelt had no idea Gonzalez was planning to be at the theater that night and Gonzalez would have had no reason to believe that Bartelt would be present at that showing of Jumanji. There was no evidence presented that Gonzalez's posts were directed at Bartelt or that Gonzalez would have had any idea that Bartelt or anyone else who might happen to be in the theater that night might also view his posts.  Gonzalez's "threat" was not communicated directly to any "victim."

¶16    As to whether Gonzalez "had made similar [posts] to the victim on other occasions," there is no evidence to suggest Gonzalez ever made similar posts of weapons or ammunition at other times and certainly no evidence suggesting he made any sort of threats to anyone at any other time, much less to any of the potential viewers of this particular showing of Jumanji.

¶17    Related to the last specific factor to be considered, the Town provided no evidence that Bartelt or anyone else "had reason to believe that [Gonzalez] had a propensity to engage in violence." *See **id.***  Indeed, there also was no evidence suggesting that Gonzalez was angry or disturbed in any way or had any motive or tendency to harm anyone, much less shoot up a movie theater full of innocent strangers.  Bartelt provided no evidence from his past

acquaintance with Gonzalez to suggest Gonzalez might even be psychologically capable of mass murder.

¶18     While we can only speculate as to why Gonzalez chose to post the photos he did when he did, it is equally hard to imagine why, if Gonzalez was really intending to truly threaten a mass shooting at that Jumanji showing, he would have posted the handgun photo to Snapchat instead of including it with the other photos on his Instagram story.  By posting it to Snapchat, any potential "threat" is much more vague, questionable, and ambiguous, as is whether he was trying to convey a threat at all.  Would a person in Gonzalez's position have reasonably foreseen that one of his 300 social media followers would not only be at the same showing of Jumanji but would also view his stories—on both Instagram and Snapchat—prior to the conclusion of the movie and also reasonably interpret the posts "as a serious expression of a purpose to inflict harm" as opposed to something "innocuous" or posted in "jest," albeit very tasteless jest? *See id.* (citation omitted).  As Gonzalez states in his brief-in-chief on appeal, "[a]n objective speaker in Gonzalez's shoes would be hard pressed to realize his posts on different app platforms would be put together into one vaguely or impliedly threatening narrative."  We note the Town's own suggestion before the circuit court, discussing whether Gonzalez's posts represented a true threat, that the "sequence of photos" may have been just "an unfortunate set of circumstances or negligen[ce] or irresponsib[ility]."  While the Town does assert in its appellate briefing that the photos Gonzalez posted "created the risk of imminent public disorder," it also states that "the posts that Gonzalez made on his social media may not have been inherently threatening."

¶19     For the foregoing reasons, we conclude that Gonzalez's posts did not constitute a true threat.  As a result, they retained the protection of the First

9

Amendment. We reverse and remand this case to the circuit court with instructions to vacate the conviction and enter an order dismissing the case with prejudice.[5]

>*By the Court.*—Judgment reversed and cause remanded with directions.

>This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.

---

[5] The parties debate various other issues and arguments on appeal; however, because the ground upon which we decide this case is dispositive, we need not address these other matters. *See* ***Barrows v. American Fam. Ins. Co.***, 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d 508 (2013) ("An appellate court need not address every issue raised by the parties when one issue is dispositive.").