COURT OF APPEALS
DECISION
DATED AND FILED

May 21, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2019AP1100**

**STATE OF WISCONSIN**

Cir. Ct. No.  **2018JV39**

**IN COURT OF APPEALS
DISTRICT IV**

IN THE INTEREST OF A. N. G.,
A PERSON UNDER THE AGE OF 17:

STATE OF WISCONSIN,

    PETITIONER-RESPONDENT,

  V.

A. N. G.,

    RESPONDENT-APPELLANT.

---

APPEAL from an order of the circuit court for Waupaca County: TROY L. NIELSEN, Judge. *Reversed and cause remanded with directions*.

¶1     BLANCHARD, J.[1]  A.N.G. appeals an order adjudicating him delinquent, as party to a crime, of making terrorist threats and disorderly conduct.

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2017-18). All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

The State alleges that then middle school student A.N.G., while at school, helped create a drawing containing terroristic threats and failed to destroy it before a teacher discovered it, under circumstances likely to cause or provoke a disturbance. A.N.G. argues that he did not convey a "true threat" and therefore the First Amendment bars prosecution. Applying the multi-factor test in *State v. Perkins*, 2001 WI 46, 243 Wis. 2d 141, 626 N.W.2d 762, I conclude that his conduct did not constitute the making of a true threat. The most significant consideration is the circuit court's factual finding that A.N.G. intended the drawing to be a private communication, not to be shared with others. Accordingly, I reverse and remand to the circuit court with directions to vacate both adjudications and dismiss the delinquency petition.[2]

## BACKGROUND

¶2 The State filed a delinquency petition alleging that A.N.G. had, in each case as a party to the crime, made a terrorist threat contrary to WIS. STAT. § 947.019(1)(e), and committed disorderly conduct, contrary to WIS. STAT. § 947.01(1), all as part of the same incident.[3] A.N.G. moved to dismiss the petition and the circuit court denied the motion on the ground that the petition provided a sufficient basis to proceed to a fact-finding hearing under WIS. STAT. § 938.31(1),

---

[2] The State does not argue that the First Amendment true-threat analysis differs between the two adjudications and I see no reason to distinguish between them. Accordingly, both are reversed under the same analysis provided below.

[3] WISCONSIN STAT. § 947.019(1)(e) provides in pertinent part that it is a Class I felony for a person to: (1) "threaten[] to cause the death of or bodily harm to any person or to damage any person's property, (2) when the threat "creates an unreasonable and substantial risk of" preventing the occupation of or causing the evacuation of a school premises, or any room within a school premises, and (3) the person is "aware of that risk." *See also* § 947.019(1)(a); WIS JI—CRIMINAL 1925B. WISCONSIN STAT. § 947.01(1) provides that "[w]hoever, in a public or private place, engages in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance is guilty of a Class B misdemeanor."

(4) (circuit court holds fact-finding hearing to determine if the allegations of a delinquency petition are supported beyond a reasonable doubt).

¶3 The court found the following facts. In 2018, A.N.G. and T.B. were classmates in a middle school summer school program. During class one day, T.B. created a drawing on a page in his science workbook. T.B. did all the drawing and writing, but A.N.G. contributed ideas.

¶4 The drawing contained T.B. and A.N.G.'s names, images of what appears to be a cartoon-style bomb, a building labeled "school," and a body lying on the ground. Around these images are written the following words: "pigs," "preplay," "bomb," and "gun."[4] The court determined that the content of the drawing "conveys a threat of bodily harm." However, as will be significant in analysis below, the court also specifically found that T.B. and A.N.G. did not intend for the drawing to be "for public consumption." Instead, the court found, T.B. and A.N.G. intended to keep it "private."

¶5 Approximately two weeks after T.B. created the drawing with input from A.N.G., a teacher "noticed some communication between" T.B. and A.N.G. during a class period and "approached them." The teacher "thought maybe they were exchanging a note … or somehow this note came to the attention of the teacher." The teacher asked to see the note and T.B. handed it to her. It was the drawing in this case.

¶6 While the circuit court did not find the following specific facts, they are established by undisputed testimony. After obtaining and looking at the

---

[4] Multiple witnesses testified that "preplay" can be a reference to a planned play in a football game, either in real life or in a video game.

drawing, the teacher questioned both T.B. and A.N.G. individually about it. Then she sent the two boys to the school's administrative office, where they were interviewed by the assistant principal. A.N.G. received an in-school suspension as discipline. School administrators contacted police. Police interviewed A.N.G. and T.B. at the school and then conducted searches of both of the residences of A.N.G. and T.B. The officers did not find anything concerning in either residence.

¶7     Returning to the circuit court's decision, the court stated that it considered it "impossible," "in the atmosphere in which we live," that "a student would create a document like this and not assume a reasonable person would interpret" it as a "threat" that was "a serious expression of an intent to do harm." However, as discussed below, this observation assumes an intended recipient of, or (using the term from First Amendment doctrine) "listener" to, the document, and in this case there was no intended recipient-listener.

¶8     At the close of the fact-finding hearing, the circuit court held that the drawing was a true threat, rejecting A.N.G.'s argument to the contrary, and adjudicated A.N.G. delinquent on both counts. A.N.G. appeals.

## DISCUSSION

### Legal Standards

¶9     I follow the parties regarding the standard of review. They agree that the de novo standard applies to resolve the following issue of law: whether it was proper to deny A.N.G.'s motion to dismiss the juvenile petition based on First Amendment protection for this expressive activity. *See State v. A.S.*, 2001 WI 48, ¶¶18-19, 243 Wis. 2d 173, 626 N.W.2d 712 ("application of constitutional principles to a set of facts is a question of constitutional fact, which is a question of

law").[5]  However, in determining the facts, this court defers to the circuit court's findings unless they are clearly erroneous.  WIS. STAT. § 805.17(2).

¶10     The First Amendment protection against government interference with the freedom of expression does not extend to prevent prosecution of a "true threat."  *Perkins*, 243 Wis. 2d 141, ¶17.  As our supreme court has explained,

> A true threat is determined using an objective reasonable person standard.  A true threat is a statement that a speaker would reasonably foresee that a listener would reasonably interpret as a serious expression of a purpose to inflict harm, as distinguished from hyperbole, jest, innocuous talk, expressions or political views or other similarly protected speech.  It is not necessary that the speaker have the ability to carry out the threat.  In determining whether a statement is a true threat, the totality of the circumstances must be considered.

*Id.*, ¶29 (footnotes omitted).  This objective standard is applied to "the perspectives of both the speaker and listener."[6]  *Id.*  When applying this objective test, this court considers "the full context of the statement, including all relevant factors that might affect how the statement could reasonably be interpreted."  *Id.*, ¶31.

---

[5] I apply a de novo standard of review in line with *State v. A.S.*, 2001 WI 48, 243 Wis. 2d 173, 626 N.W.2d 712.  However, I recognize that our supreme court has suggested applying alternate standards of review in true threat cases.  In *Perkins*, the court stated, "courts have viewed the question whether an alleged statement constitutes a true threat, unprotected by the First Amendment, as an issue of fact for the fact finder unless a court can determine that the evidence is insufficient, as a matter of law to support the defendant's conviction under the statute."  *State v. Perkins*, 2001 WI 46, ¶48, 243 Wis. 2d 141, 626 N.W.2d 767.  Further, in *Douglas D.*, the court stated, "[t]he question of whether particular conduct constitutes a true threat is an issue of fact, typically best left for the finder of fact."  *State v. Douglas D.*, 2001 WI 47, ¶33, 243 Wis. 2d 204, 626 N.W.2d 725.  However, the court further stated that, "if the conduct unquestionably is protected by the First Amendment, a court may dismiss the charge as a matter of law."  *Id.* (citing *Perkins*, 243 Wis. 2d 141, ¶48).  If I were to apply the standard of review suggested in *Douglas D.*, the result would be the same, because in my view A.N.G.'s conduct is unquestionably protected by the First Amendment for reasons explained in the text.

[6] As our supreme court has noted, the terms "'speaker'" and "'listener'" are construed broadly and include "all conveyors and recipients of true threats" because true threats may be conveyed by means other than speech.  *Douglas D.*, 243 Wis. 2d 204, ¶34 n.12.  The doctrinal term "listener" in this case means a recipient of the drawing.

¶11     In considering the totality of the circumstances, courts have a non-exhaustive list of factors to consider:

> "how the recipient and other listeners reacted to the alleged threat, whether the threat was conditional, whether [the threat] was communicated directly to its victim, whether the maker of the threat had made similar statements to the victim on other occasions, and whether the victim had reason to believe that the maker of the threat had a propensity to engage in violence."

*Id.* (quoting *United States v. Hart*, 212 F.3d 1067, 1071 (8th Cir. 2000)).   First Amendment protection is so strong that it applies no matter how "offensive" or "distasteful" a threatening type communication might be, so long as it is not a true threat.  *State v. Douglas D.*, 2001 WI 47, ¶41, 243 Wis. 2d 204, 626 N.W.2d 625.

*Analysis*

¶12     A.N.G. argues that the drawing did not constitute a true threat for the following reasons:   he and T.B. intended to keep it private and it was not communicated directly to a victim; it did not cause administrators to take stronger action, such as more significant discipline or ordering an evacuation of the school; it was not detailed or vivid in conveying any particular threat; and school staff had no reason to believe that A.N.G. had a propensity to engage in violence.

¶13     The State argues that the drawing was a true threat because it was not created as part of a classroom assignment or a creative school-related expression. The State also contends that it was not mere hyperbole or an innocuous joke. Further, the State argues that the drawing was not reasonably intended to be kept private because it was reasonably foreseeable to A.N.G. that it would be seen in the school setting by school staff or other students who would interpret it as a serious

6

expression of a purpose to inflict harm, and that, when it was discovered, school officials did reasonably interpret it this way.

¶14    I begin by addressing one of the circuit court's findings that is highly significant to my analysis, as I have already suggested, and then apply in turn each of the true threat factors from *Perkins*.

¶15    I do not treat the circuit court's finding that A.N.G. and T.B. intended to keep the drawing private as dispositive, but it figures prominently in my determination that A.N.G.'s actions did not constitute a true threat. Because A.N.G. did not intend for there to be any recipient-listener whatsoever, by definition it could not have been possible for A.N.G., as a speaker, to "reasonably foresee that a listener would reasonably interpret as a serious expression of a purpose to inflict harm."

¶16    I understand the State to argue that, even if T.B. and A.N.G. subjectively intended to keep the drawing private, A.N.G. could not have *reasonably* expected that it be kept private between the two boys. The State points to evidence that the drawing was: shown to a third student when T.B. was creating it; created in class during school, when other students were present; created on a page in a school book that was stored on school premises; and discovered during classroom instruction. However, these additional facts do not equate to an intent to show the drawing to others as a threat. The State's approach would turn this part of the analysis on its head. The issue regarding the sharing of the drawing is whether the drawing was intended as a true threat, not whether the boys were not as careful as they could have been in handling a drawing that they meant to keep private.[7]

---

[7] The State's argument on this point appears to focus primarily on whether A.N.G. could have had an objectively reasonable expectation that the drawing not be shared with a recipient-

7

¶17     I see no reasonable way to construe the findings of the circuit court and the uncontested testimony at the hearing to reflect that A.N.G. meant to cause the drawing to come to the teacher's attention, or to the attention of any other school staff or students other than T.B., its co-creator. Based on the circuit court's findings and the uncontested evidence, the teacher's awareness of the drawing and decision to demand it were just accidental from A.N.G.'s point of view. This would be a different case if the boys took steps that had the effect of inviting any school staff or other students to view the drawing, or if there was evidence that A.N.G. knew that this workbook was going to be reviewed by the teacher after the drawing's creation, or that the drawing was displayed conspicuously on the workbook. The State does not point to any such evidence.

¶18     The additional facts pointed to by the State are reasons to believe that the two boys took some degree of risk, as the circuit court noted, that the drawing *might* be viewed by others in the school setting, and depending on who saw and under what circumstances, it *might* be understood as a true threat. But, contrary to the State's suggestion, it is not clear from any finding of the circuit court or undisputed testimony that the third student present for the drawing's creation understood what T.B. and A.N.G. were up to at the time, much less that the third student understood it to be in the nature of a true threat. Similarly, in addressing the teacher's discovery of the drawing, the circuit court noted that it is not clear whether A.N.G. passed the drawing to T.B. in a way that increased the risk that a teacher

listener in the school setting. However, several references in the State's brief appear to challenge the circuit court's finding that A.N.G. and T.B. subjectively intended to keep the drawing private. To the extent that the State means to argue that the circuit court clearly erred in finding that A.N.G. and T.B. meant to keep it private, this argument fails. The record supports the circuit court's finding. T.B. testified that only he and A.N.G. participated in the creation of the drawing and that they did not show it to anyone else after creating it. T.B. further testified that he intended to throw the drawing away, but simply forgot to do so.

would "intercept" it and discover its contents. More fundamentally, as I next address, I conclude that the State's premise regarding the objective nature of the true threat test is only partially correct.

¶19 The State further makes an argument based on the fact that the test for whether an expression constitutes a true threat is based in part on the perspectives of how *reasonable people* in the positions of a speaker and the recipient of the expression would view it. Given that objective-person test, the State contends, A.N.G.'s subjective intent to keep the drawing private is irrelevant. The State notes that our supreme court has explained that the objective-person test articulated in ***Perkins*** "does not require specific intent." *See **Douglas D.***, 243 Wis. 2d 204, ¶34 n.13. However, the "specific intent" referred to in ***Douglas D.*** is that of the "speaker" to actually carry out a threat, not an intent to deliver a threat in the first place. *See **id.*** (gathering cases rejecting need to prove specific intent to carry out threat).

¶20 Further, while the State starts from the correct premise about the overall objective nature of the test, it misapplies that concept by extending it to whether the "speaker" intends there to be a "listener." *See **id.*** The question here, unlike in ***Douglas D.***, is not purely how objectively reasonable "speakers" and "listeners" would view the content of threatening material that the speakers indisputably meant to share with listeners. *See **id.***, ¶6 (juvenile defendant in ***Douglas D.*** directly handed threatening classroom assignment to intended recipient). Whether A.N.G. intended the drawing to be kept private between him and T.B. is relevant to this analysis. The United States Supreme Court has explained that "'[t]rue threats' encompass those statements where the speaker *means to communicate* a serious expression of an intent to commit an act of unlawful violence

to a particular individual or group of individuals." ***Virginia v. Black***, 538 U.S. 343, 359 (2003) (emphasis added).

¶21 Some federal circuits have taken this "means to communicate" language to require that the speaker intentionally or knowingly communicate the threat to either the object of the threat or a third person.[8] Under the logic of this case law, a reasonable person would not knowingly or intentionally communicate something that he or she intends to keep private. However, to repeat, I do not treat A.N.G.'s lack of intent to communicate the threat here as a threshold or dispositive issue. Instead, it counts as a significant fact weighing against true threat status under the multi-factor test that A.N.G. and T.B. intended to keep the drawing private, did not "mean to communicate" it to others, and did not intentionally or recklessly communicate it others. I now turn to the specific ***Perkins*** factors.

*How Recipient-Listener Reacted*

¶22 For the reasons just discussed, I reject the premise running throughout the State's arguments that the teacher who obtained the drawing and other school

---

[8] While I do not apply it as persuasive authority, I observe that the Fifth and Eighth federal circuit courts of appeals in true threat cases treat the issue of whether the accused had an intent to communicate the threat as a potentially dispositive threshold issue: no intended listener, no true threat. *See **Porter v. Ascension Parish School Bd.***, 393 F.3d 608, 616-17 (5th Cir. 2004); ***Doe v. Pulaski Cty. Special Sch. Dist.***, 306 F.3d 616, 624 (8th Cir. 2002) (a "speaker must have intentionally or knowingly communicated the statement in question to someone before he or she may be punished or disciplined for it. The requirement is satisfied if the speaker communicates the statement to the object of the purported threat *or* to a third party." (citation omitted)).

It is true that, in many true threat cases that evaluate the intent to communicate as a threshold issue, the communication was created in the privacy of the speaker's residence, and that is not the case here. *See **id.*** (citing ***Stanley v. Georgia***, 394 U.S. 557, 564-68 (1969)) (explaining that the "government has no business telling an individual what he may read or view in the privacy of his own home."). As the State here now emphasizes, A.N.G.'s drawing was created and kept in a school. Nevertheless, it is relevant to the analysis here that the First Amendment protects individuals from government intrusion on their private thoughts—that is, thoughts that they do not intend to share with others.

officials who learned of the drawing from the teacher were "listeners" of the drawing, who might have reasonably interpreted it as a serious expression of a purpose to inflict harm.

¶23 Moreover, even if I were to assume that school personnel could reasonably be classified as "listeners," how these "listeners reacted to the" drawing (as *Perkins* refers to the first factor) does not weigh heavily towards classifying the drawing as a true threat. Based on the testimony of the teacher and administrators involved, the circuit court found that the drawing was "obviously concerning [to the school] and obviously the school took steps within the school setting to address these issues." Yet, they did not take it so seriously that there was an evacuation or a search of the school. Further, instead of seeking to have A.N.G. removed from the school, administrators placed A.N.G. in an in-school suspension and did not impose more significant discipline. The assistant principal testified that she takes seriously *all* expressions that she construes to be threats, suggesting a low threshold for school reaction to any and all conduct that might represent a danger.

¶24 The steps that school staff took in response to the drawing do not necessarily support a determination that they considered it to be a true threat in the constitutional sense. Their approach, including the discipline given to A.N.G. over the drawing, is no doubt one reasonable approach for school administrators to take in light of violent acts that have tragically occurred in schools in Wisconsin and elsewhere. Given these events, any expression that could suggest the possibility of school violence must be taken seriously by school staff and by first responders called in by school staff.

¶25 However, the fact that the school reacted with some discipline is only one consideration. The range of school discipline that may be imposed on students

11

in reaction to a perceived threat is given more latitude under the First Amendment than is allowed in a juvenile prosecution. *See **Douglas D.***, 243 Wis. 2d 204, ¶¶42-46 (discussing ability of school to take disciplinary action on conduct that did not constitute a true threat). And, there is not a strong record here of how school personnel viewed the content of the drawing—beyond that there was a "serious" response, which is how the school responds to "all threats," and an intermediate level of discipline. This mitigates how much this factor can weigh in favor of true threat classification, even setting aside the lack of an intended "listener." *See **id.***, ¶31 ("'Threat' is a nebulous term that can describe anything from '[a]n expression of an intention to inflict pain, injury, evil, or punishment' to any generalized 'menace'" and therefore some "threats" are protected while other are not).

### *Whether Threat Was Conditional*

¶26    The next factor is whether the threat was merely conditional or veiled, as opposed to conveying a direct or immediate prediction of harm. As we discuss in the following paragraphs, certain kinds of conditions attached to a threat can weigh against a determination of a true threat. *See **id.***, ¶34. The circuit court made no findings regarding the conditionality of any threat conveyed by the drawing.

¶27    There does not appear to have been in-depth discussion to date in Wisconsin case law on the conditionality factor. However, discussion in ***Douglas D.*** and ***Perkins***, as well as discussion by the U.S. Supreme Court, suggests that conditionality as a factor is tied to the clarity of an "'expression[] of intention *immediately* to inflict injury.'" *See **id.***, ¶35 (emphasis added) (quoting ***United States v. Kelner***, 534 F.2d 1020, 1027 (2d Cir. 1976)); ***Perkins***, 243 Wis. 2d 141, ¶23 (noting disagreement among federal circuit courts as to whether threats must be unconditional to constitute true threats); ***Watts v. U.S.***, 394 U.S. 705, 707-08 (1969)

(expressly conditional nature of statement at issue weighed against true threat classification; hyperbolic threat against president was conditioned on contingency that speaker vowed would never happen). Thus, the conditionality of a threat may weigh against true threat classification to the extent that it dilutes the immediacy, clarity, or specificity of an evident intent to cause harm.

¶28 At the same time, *Douglas D.* makes clear that an ambiguous or conditional threat may still be a true threat. *See Douglas D.*, 243 Wis. 2d 204, ¶34 n.14 (citing federal circuits to explain that "ambiguous or conditional language" can constitute a true threat, *despite* the listing of conditionality as a factor of the true threat analysis). As some argument by A.N.G. implies, this would comport with common sense, in that at least some kinds of conditions or qualifications attached to some kinds of threats would tend to make them more vivid and concrete, not less so (*e.g.*, "If you so much as raise a hand, I will …," or "If you try to walk away from me, I will ….").

¶29 A.N.G.'s argument on this point may technically confuse the concept of conditionality, as referenced in some case law, with the closely related concept of how vivid or concrete a threat is. If so, A.N.G.'s confusion may be understandable, given the lack of in-depth discussion in the case law. A.N.G. is correct that the drawing here lacks specificity in several respects. Most notably, it fails to clearly signal when, where, or how any particular violent act would occur. This makes it difficult to see it as a vivid threat of a bombing or shooting planned for a particular place or particular time at or around the school. That is, the drawing does not clearly express an immediate or specific intent to cause harm, given its highly ambiguous, cartoonish content and style.

¶30    However, it is also true that there is no evident condition or qualification attached to darker implications of the drawing, which after all seemingly references a shooting or a bombing of some kind, and a reference to "school," and the drawing was not obviously related to any school assignment or topic. For this reason, A.N.G. does not have the full benefit of conditionality as a factor under the true threat analysis.

¶31    In sum, I cannot conclude that the conditionality of any threat conveyed by the drawing on its face could weigh heavily here. Weighing these competing considerations, I conclude that the conditionality factor cannot be said to carry any weight in this case.

*Whether Threat Was Communicated Directly To Victim*

¶32    As I have emphasized, there was no intent to "communicate" the drawing to anyone. ***Douglas D.*** provides some guidance on this point. There, the juvenile handed a threatening story directly to the teacher who was the subject of the story, and our supreme court determined that this did not convey a true threat. ***Douglas D.***, 243 Wis. 2d 204, ¶36. And, in ***Robert T.***, this court determined that there was a true threat in part because the juvenile communicated a bomb threat by calling the police, "apparently intending to frighten the listener" (namely, the police). ***State v. Robert T.***, 2008 WI App 22, ¶¶2, 16, 307 Wis. 2d 488, 746 N.W.2d 564. This factor clearly weighs against classifying the drawing as a true threat.

*Whether Speaker Had Made Similar Statements To The Victim On Other Occasions*

¶33    As summarized above, A.N.G. made a threatening statement at the same school six months prior to the drawing incident and was counseled regarding the earlier statement. The earlier statement was certainly concerning: "Get out of

the hallway before I turn this into a shooting range." The State argues that A.N.G. knew the effect that co-creating the drawing here would have on school staff or students, if it were viewed by them, because of the earlier incident and the resulting counseling he received. Specifically, the argument proceeds, A.N.G. knew or should have known, based on the prior incident, that school staff or students would interpret the drawing as a serious expression of a purpose to inflict harm. I agree that this factor counts in favor of a true threat. It creates a reasonable presumption that A.N.G. was aware that the school takes threats seriously and that his expressions, *if in fact conveyed to staff or students*, could trigger alarm.

¶34 At the same time, this prior-act factor does not weigh heavily because, if one considers school staff and students as the "victim" under this factor, A.N.G. did not intend his prior victim to become a victim again through the drawing. That is, while A.N.G. was on notice that the prior incident would likely be considered as a disturbing context for any subsequent threatening-type behavior by him at school, he did not intend to threaten anyone with the drawing.

*Whether Victim Had Reason To Believe That The Maker Had A Propensity To Violence*

¶35 If a "speaker" has a known propensity to engage in violent behavior (not just a propensity to talk about it or threaten it), this makes it more likely that reasonable persons in the position of the "speaker" and "listener" would conclude subsequent threatening behavior constituted a true threat. *See Douglas D.*, 243 Wis. 2d 204, ¶37 (noting lack of evidence that juvenile defendant had propensity to engage in violence when applying *Perkins* factors to conclude that he had not made a true threat); *Doe v. Pulaski Cty. Special Sch. Dist.*, 306 F.3d 616, 626 (8th Cir. 2002) (noting evidence of speaker's "violent propensities" before concluding he had made a true threat). The circuit court here does not appear to have made a finding

regarding any evidence that A.N.G. demonstrated to pertinent "listeners" a tendency to actually engage in violent behavior, and the parties do not point to such evidence. *See Douglas D.*, 243 Wis. 2d 204, ¶34 n.12 ("The 'reasonable speaker' and 'reasonable listener' are limited in knowledge to the facts readily available to the actual speaker and/or the actual listener at the time of the speech at issue.").

¶36     The State essentially concedes that there is no evidence that school staff members were aware of A.N.G. having a propensity to engage in violence. However, the State argues that this factor is not relevant because the speaker of a true threat need not be capable of carrying out the threat. I disagree.

¶37     It is true that, in *Perkins*, our supreme court explains that "[i]t is not necessary that the speaker [of a true threat] have the ability to carry out the threat." *Perkins*, 243 Wis. 2d 141, ¶29. Based on this, it is further true that it does not count against true threat classification here that there does not appear to be evidence, known to pertinent listeners, that A.N.G. did not possess the know how or access to materials sufficient to construct a functional explosive device of some kind or that he had access to a functioning firearm and ammunition. However, the objective ability of the speaker to carry out the specific threat that he or she makes is different from the speaker's known propensity to engage in violent behavior of the type referred to in the threat (even if the same evidence might be relevant to both issues). Regarding the propensity factor, the statement in *Perkins* about the inability to carry out a threat cautions that such considerations are not necessarily dispositive, but does not go so far as to suggest that they are irrelevant. Thus, contrary to the State's argument, I may not categorically ignore the lack of propensity factor, which counts against true threat status. *Id.*, ¶31.

*Additional Considerations*

¶38    The State makes an argument not explicitly tied to any particular *Perkins* factor.  It contends that it weighs in favor of true threat status that the drawing was not created in the context of a school assignment and was not a creative expression at school.  The State also contends it was not in the nature of hyperbole or a harmless joke.  *See **Douglas D.***, 243 Wis. 2d 204, ¶34 (quoting ***Perkins***, 243 Wis. 2d 141, ¶29) (distinguishing a true threat from "'hyperbole, jest, innocuous talk'").  It is true that, unlike the story created in the context of a creative writing assignment in ***Douglas D.***, A.N.G. did not co-create the drawing in the context of a school assignment.  *See id.*, ¶38 (considering it significant that student did not write story in math class, "where such a tale likely would be grossly outside the scope of his assigned work").  However, T.B. testified that the drawing was meant as a joke that he never intended to share with anyone besides A.N.G., its co-creator.  While features of the drawing are no doubt, even for middle schoolers, offensive and distasteful, they do not render it a true threat in the constitutional sense.  *See id.*, ¶41 (offensive and distasteful nature of writing that was threatening to teacher was protected by First Amendment).

¶39    Weighing all of the above considerations under the ***Perkins*** factors, I conclude that A.N.G.'s private drawing was not a true threat in the constitutional sense.  Based on all of the circumstances, a reasonable "speaker" in A.N.G.'s position would not foresee that a reasonable "listener"—someone he never in fact envisioned—would interpret the drawing as a serious expression of a purpose to inflict harm.  Case law interpreting the First Amendment protects from prosecution the expressions under the particular facts here.

**CONCLUSION**

¶40     For all of these reasons, I reverse the circuit court's order denying A.N.G.'s motion to dismiss the petition and remand with directions to vacate both adjudications and dismiss the delinquency petition.

*By the Court*.—Order reversed and cause remanded with directions.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)4.